**COMMONWEALTH of Kentucky, DEPT. OF HIGHWAYS, Appellant,**

v.

**Ted GEARHART et al., Appellees.**

Court of Appeals of Kentucky.

Nov. 6, 1964.

John B. Breckinridge, Atty. Gen., Wm. A. Lamkin, Jr., Asst. Atty. Gen., Frankfort, Walter Mobley, Flemingsburg, J. G. M. Robinson, Caldwell & Robinson, Ashland, for appellant.

John T. Diederich, H. David Hermansdorfer, Ashland, J. W. Blackburn, Louisville, for appellees.

DAVIS, Commissioner.

The appellant Department of Highways is condemning a portion of appellees' land for highway right of way incident to construction of non-access Interstate Highway 64. The jury awarded verdict to appellees for $65,000; this was itemized as $50,000 for the land taken, plus $15,000 resultant damages to the remaining property. (Trial was had before Com., Dept. of Highways v. Sherrod, Ky., 367 S.W.2d 844.)

The appellant presents asserted errors in the admission of evidence and excessiveness of the verdict as its bases for this appeal.

Before the taking, the appellees owned a boundary of land containing approximately 154 acres. The property was being (and for many years had been) used for grazing a small amount of livestock. The land lies about ten miles from Ashland, with about 2300 feet of frontage on Terrapin Road.

The frontage along Terrapin Road is not disturbed by the instant taking. The right of way taken embraces about 61 acres; the nature of the taking also effectively severs an additional ten acres, more or less. The parties tried the case on the agreed premise that the severed land is included with the right of way taking, so that for practical purposes the total taking is of 71 acres.

The land taken is a strip running generally east and west along the entire southern portion of the farm. Embraced within the taking were the somewhat meager improvements on the place. (Appellees' witness Alexander placed an aggregate value of $3,254 on all the improvements.) Numerous photographs depicting the improvements and the condition of growth on the surface confirm the description of the land as steep and hilly, except for a garden plot and about two acres of bottom land. The garden area is taken but the bottom land remains.

Near the southwestern corner of the original tract, at a jutting point, the western side of the farm abutted Kentucky Highway 180; the latter was "hardtop" road, whereas Terrapin Road is gravel surface. After the taking the remaining land will not abut Highway 180. It appears that the general farm use of the property had been to and from Highway 180.

The Department offered six evaluation witnesses whose respective estimates are thus summarized:

| Before Value | After Value | Difference |
|---|---|---|
| $15,000 | $11,000 | $4,000 |
| 14,900 | 7,715 | 7,185 |
| 11,900 | 4,800 | 7,100 |
| 14,200 | 7,900 | 6,300 |
| 14,041 | 7,951 | 6,090 |
| 31,763 | 17,267 | 14,495 |

It is appropriate to point out that the appellant's witness who furnished the highest and last listed figure based his evaluations on his estimates of the presence of some recoverable #7 coal.

In sharp contrast, the appellees offered four witnesses who gave evaluation testimony as follows:

| Before Value | After Value | Difference |
|---|---|---|
| $129,000 | $16,400 | $112,600 |
| 134,610 | 26,600 | 108,010 |
| 120,363 | 26,290 | 94,073 |
| 118,378 | 20,800 | 97,578 |

For the appellant it was shown that the entire property had been reported to the county tax assessor at the value of $2,345 for the two years next before the taking date.

The extremely wide variances in the values stem from the differences as to whether the land is underlain with recoverable coal in economically significant quantity and quality. For the Department there was evidence of three core drills, two of which were within the original boundary, and one just south of the tract. The Department's witness stated that the #1 core drill reflected a vein of #7 coal, eight inches thick, at a point 139 feet, 3 inches below the surface. The coal experts for each side concede that an 8-inch vein could not be mined economically.

The #2 core drill was on the Brumfield property, just south of the southwestern portion of appellees' farm. This core drill revealed a vein of #7 coal, 2 feet, 10 inches thick; the bottom of the vein was found 64 feet under the surface. The Department's witness expressed the view that strip or auger mining could not be feasibly done in areas having overburden in excess of 40 feet on the back side of the stripping pit.

The #3 core drill was within the original farm boundary, at the northeast corner of the right of way strip. This drill disclosed three veins of #7 coal, varying in thickness from three inches to 30½ inches; the veins are separated by bone shale, and in the aggregate total 42 inches of workable coal.

The same witness for the Department expressed the view that none of the coal under appellees' farm could be deep mined within economic limits.

Two of the appraisal witnesses offered for appellees based their evaluations upon the accuracy of a mining engineer's report as to the quantity and quality of the coal. The mining engineer had prepared a detailed report, but the trial court did not permit the report to be introduced before the jury; the report was made part of the record by avowal. However, the mining engineer testified in person to the essential matters contained in his report. The engineer also had inspected one of three old drift mine openings on the property; he had observed a seam of #7 coal having thickness of 36 inches in that old opening. Additionally, the engineer had examined a fourth core drill, which had been obtained at the instance of appellees. The latter drill, referred to as hole #4, revealed a seam of #7 coal twenty-five inches thick.

The engineer for appellees explained that he had studied the land, its coal outcroppings, and the pertinent history of the area as it pertains to coal productivity. He gave as his estimate that 200,869.24 tons of recoverable coal are under 69.04 acres of the land taken. Of this total, he reckoned that only 7.82 acres could be recovered by strip or auger mining—that 61.22 acres of it would have to be deep mined.

The same engineer said that the coal under the remaining land could be mined, but that it is not as desirable as the coal underlying the taken land. He explained his reasoning as based on the factors that the remaining land would be too small to be attractive to buyers, that the height of the coal in the remaining land is not as adequate, and loss of accessibility to a "much better road." The engineer admitted that he could not foretell just what areas would be mineable, nor what the exact thickness of the vein would be until the mining process is actually undertaken.

The appellees presented a topographical map upon which are indicated numerous

strip and auger mining operations in the general vicinity of the instant land. Some significance may be given to the fact that the map fails to reflect any deep mining operations.

Appellees' witness Seaton expressed the view that before the taking the coal could have been deep mined. It was the opinion of the witness that by reason of the taking the "coal value" to the remaining land was lost. He ascribed much of his reasoning for this to the premise that access to the "hard road" (Ky. Highway 180) will be lost. This witness gave it as his judgment that the best, and indeed the only, feasible place to make a coal mining opening was in Ford Hollow, near the southwest portion of the farm—a place encompassed within the taken right of way. Significantly, this witness gave no evidence of having considered any of the four core drill holes, nor did he explain just how he was able to estimate what the extent of the underlying coal was. He is in the coal business, and did examine the coal openings. He said that he found the coal to be in workable size and "the conditions looked ideal." The witness stated that in his estimate the roof material necessary for deep mining appeared "all right to me." It is noted that the witness did not report any result of coal measurement in specific inches. The witness stated that the value of the land taken is $63,600 and the damage to the remainder is $49,000. Thus, he arrives at an after market value of $16,400 for the surface of the eighty acres left.

Appellees also presented evaluation witness Conley, who had seen the coal in the three old drift mines in 1932 or 1933, when the witness was fifteen years old. He recalled that the coal veins varied in thickness from 36 to 42 inches. This witness put a before value of $134,610 on the property; he said the after value is $26,600—and this is for the surface only—the underlying coal on the remainder has no value. One prime reason he gave for considering coal under the remainder as valueless is the lack of ingress and egress to it. The witness disclaimed knowledge of the results of any of the four core drills. He said that he based his values on deep mining.

Appellee, Ted Gearhart, did testify but did not undertake to place any evaluation figures as to any facet of the case. He related that the three old drift mines had once been "leased out," but that he had not done so; he did recall that he let Tom Enyart "go in one time." Enyart testified and said that he mined 35–40 tons of coal from the premises some eight to ten years ago. Enyart quit the project because he had to walk too far to and from his home.

Other evidence for appellees relates to the land's potential as a subdivision project. Evidence was presented that potentially valuable building sites near Highway 180 are taken.

Our purpose in relating the evidence for appellees in such detail is to lay foundation for proper examination of the critical question whether the verdict is so palpably excessive as to require reversal.

▮▮▮ Patently, the verdict is within the range of the value figures. However, this alone is not sufficient to foreclose inquiry whether the verdict is palpably excessive; neither does it preclude testing whether the verdict is adequately supported by evidence of probative value. We have recognized the rule that a verdict will not be disturbed as excessive, generally, unless it shows bias or prejudice, or is based on estimates unsupported by the facts, or is so extravagant as to create a probability the estimates are incorrect. Salt River Rural Electric Co-op. Corp. v. Thurman, Ky., 275 S.W.2d 780; Com., Dept. of Highways v. Rankin, Ky., 346 S.W.2d 714; Com., Dept. of Highways v. Tyree, Ky., 365 S.W.2d 472, and authorities there cited.

▮▮▮ In this case the appellees seek to demonstrate a market value, apart from the usual surface usages, based upon valuable coal deposits. There is no dispute that the matter of underlying valuable minerals is

a proper basis for computing market value; the question is whether the quantum of proof at bar is of the character to support the instant verdict. In our view, the appellees have failed to adduce evidence of sufficient probative value to support the instant verdict.

As noted, one of appellees' opinion witnesses pointed out that "history" of the area is significant. It is observed that the "history" of the instant land reflects that no commercially feasible coal operation has occurred there. Additionally, the experience records that many years ago there were certain overt activities looking toward exploitation of the coal deposits—but these have long since been abandoned.

The unkept condition of the land—so vividly portrayed by the photographs in the record—materially detracts from the credibility of opinion evidence placing "before" values in excess of $100,000. Coupled with this we have the "history" of the evaluation for tax purposes at less than $2,500. Admitting that this factor is not conclusive, it is, to say the least, shocking that appellees have been able to so "low-rate" this veritable diamond in the rough—the tax value is less than 2% of any "before" value fixed by the witnesses for appellees.

We would not be understood as holding that the four core drills present such ineluctable evidence as to admit of no dispute. However, we are not impressed by the probative value of estimates as to underlying coal, when made by witnesses who confessed utter ignorance of and indifference to the results of the core drills. This is the situation with respect to value witnesses Seaton and Conley. The other two value witnesses, without relating whether they had ever been apprised of the specific core drill results, premise their "before" market value estimates on the verity of the engineer's report. The engineer, on whose report they relied, said that the coal, for the most part, was recoverable by deep mining only. Yet, the "history" of the area indicates that virtually all mining in the adjacent territory has been accomplished by the strip or auger methods.

We have pointed out that the value witnesses for appellees estimated that the loss of access to Highway 180 is a heavy damage factor to potential coal mining. In view of the fact that abundantly reasonable access to the highway system exists by way of Terrapin Road, it is doubted that any compensable loss for a projected future coal mining venture has resulted here. Cf. Com., Dept. of Highways v. Carlisle, Ky., 363 S.W.2d 104.

Appellees' witness Alexander (who had predicated his testimony of value on the coal report of the engineer) gave it as his view that the "before" value of the entire tract was $47,352.00, without reference to any coal. Thus, he placed an average price of slightly more than $300 per acre on the 154.74 acres—purely on the surface value as distinguished from any potential mineral value. In view of the pictures of the farm, the assessed value of it, the general physical descriptions of it—coupled with the undisputed evidence of sale of land just across Terrapin Road from it at $75 per acre, it becomes impossible to give complete credence to the $300 per acre value. We think it is not unreasonable to relate the inflated value which this witness assigned to the land, without minerals, to the high value he mentioned when minerals are considered.

Our cases have consistently observed the rule that it is appropriate to admit testimony of the adaptability of property for particular uses, even though the property is not then being so used. However, the rule is subject to the qualification that if the land is reasonably adaptable to another use, there must be an expectation or probability in the near future that it can or will be so used. See East Ky. Rural Elec. Co-op. Corp. v. Smith, Ky., 310 S.W.2d 535, and Bowling Green-Warren County Airport Bd. v. Long, Ky., 364 S.W.2d 167, and cases discussed therein. The "history" of the instant property, plus the absence of any statement from its owner of an inten-

tion or purpose to cause its use for coal mining or town lot subdivision, tend to diminish the probative value of the evidence of its market value based on such uses. Cf. 4 Nichols, Eminent Domain, 3d Ed., Sec. 12.314.

Under all these circumstances, we are persuaded that the rationale of Com., Dept. of Highways v. Tyree, Ky., 365 S.W.2d 472, must rule this case. The high figures testified in behalf of appellees simply are not borne out by the proof from the very witnesses who gave them. We consider that the verdict is palpably excessive. Cf. United Fuel Gas Co. v. Mauk, Ky., 325 S.W.2d 339; United Fuel Gas Co. v. Mauk, Ky.,

302 S.W.2d 368; Com., Dept. of Highways v. Lyons, Ky., 364 S.W.2d 336; Com., Dept. of Highways v. Rankin, Ky., 346 S.W.2d 714, and cases therein discussed.

 This view makes it unnecessary to consider the questions raised concerning admissibility of evidence. Suffice it to say that upon another trial care will be taken that the separation of values as to timber will not be permitted; neither should sale of property to a corporation possessing power of eminent domain be accepted as a comparable sale.

The judgment is reversed for proceedings consistent with the opinion.