**COMMONWEALTH of Kentucky, DEPT. OF HIGHWAYS, Appellant,**

**v.**

**Paul W. GARDNER et al., Appellees.**

Court of Appeals of Kentucky.

March 19, 1965.

Robert F. Matthews, Atty. Gen., Wm. A. Lamkin, Jr., Asst. Atty. Gen., Frankfort, Edmond H. Tackett, Prestonburg, for appellant.

Rudy Yessin, Frankfort, Marcus Mann, Salyersville, J. K. Wells, Paintsville, P. H. Vincent, Ashland, Cordell H. Martin, Hindman, D. G. Boleyn, Hazard, Cassie J. Allen, Prestonsburg, for appellees.

DAVIS, Commissioner.

The appellees obtained judgment for $30,000 for lands acquired by the appellant in this condemnation action. The appellant Department of Highways presents three grounds for reversal: (1) The admission of incompetent and irrelevant evidence, (2) the verdict is excessive and not supported

by sufficient evidence of probative value, and (3) an erroneous instruction was given.

Before the taking the appellees owned a boundary of land containing 359 acres. It is situated about two miles from Salyersville; the tract did not abut any public roadway before the taking. It lay on Coal Fork of Gardner Branch, approximately a thousand feet from existing Kentucky Highway 30. Such access as had ever been used to the tract was along a trail, partly in a creek bed, traversing properties owned by two others. There is no showing that any deeded or prescriptive entranceway existed so as to afford access to the public highway system. No building of any kind was on the entire 359 acres. No crop had been raised on the land for several years. According to witnesses for the appellant (and evident from the aerial photograph of the land in the record) all of the land was hillside, second and third growth timber, except six to twelve acres of crop land.

Witnesses for the appellant gave before market values ranging from $6,800 to $7,100, with after market values ranging from $500 to $545. The range as to difference in before and after values was $6,255 to $6,600, according to witnesses for appellant. On the other hand, one of the owners gave a before value of $75,000 with no after value, while other witnesses for appellees gave before values ranging from $28,000 to $31,000. None of appellees' witnesses gave any after value.

There were three abandoned gas wells on the land at the time of taking. It was shown that the sulphur content of gas from these wells ranged from 8.6 grains to 40.7 grains; a qualified witness for appellant testified that sulphur in gas exceeding one or two grains renders it noncommercial by present market standards.

There is some coal under this land. For the appellant it was shown that the coal was not in commercially significant quantity. For appellees there was evidence that the coal is there in sufficient quantity to be of considerable value. Appellees also adduced evidence that the "sour" gas wells could be rendered commercially "sweet" at relatively minor cost. It was explained that the sulphur gas is found in the Corniferous formation and the "sweet" gas emanates from the Big Six sand. A witness for appellee told how a packer could be set on top of the Big Six sand to shut off the flow of gas from the Corniferous formation. The same witness for appellees further said that he did not know whether the gas from the three wells had come from Big Six sand or Corniferous formation. The witness conceded that if the gas came from the Corniferous formation, "there wouldn't be anything you could do about it." This witness said that some four or five years before the taking he had been associated with a group planning to buy the gas rights from appellees, and that their plan had included a "cleaning plant" at cost of $40,000.

The entire 359 acres was assessed at $660 before the taking. No coal mining is being done in the area nearby. No crop has been raised on the land for years. The three old gas wells have not produced commercially for about ten years. The evidence as to the merchantable quality of the timber is not satisfactory; one witness for appellees was improperly permitted to testify that he had offered $5,000 for the timber rights on the entire tract. The tract had no direct access to any road, and was entirely unimproved. The acquired right of way consists of 17.37 acres in fee, plus 1.19 acres in three temporary easements. The taking is a strip extending about 5,900 feet through the farm, with average width of 170 feet or more. The highway will be nonaccess and severs the boundary in two. To all intents and purposes, what is left is "landlocked." (Of course, it was substantially "landlocked" to begin with.) The fact that the remaining land is "landlocked" would hardly render it valueless *if* there had been substantial value before the taking. The right to acquire an outlet (for marketing coal and timber, at least) is accorded by KRS 381.-580. It overtaxes credulity to suppose that

appellees would abandon as worthless more than 340 acres possessing the enormous values and potentials ascribed to it before the taking.

With respect to the coal, the appellee owner professed that at least 250 acres of the land is underlain with coal. He was not able to explain how this could be true in face of core drills to the contrary. However, on cross-examination he said that he had "stripped some coal up there a year or two ago. I started in and the coal business went bad—stripping that foot coal." He also admitted, "I am not so familiar with the coal business, to tell the truth." Appellees offered witness Bailey, who had seen one place on the land, some five or six years ago, where a 36 inch seam of coal was exposed. He could not remember where the spot was, nor did he analyze the coal. He assumed that there must be a 36 inch seam under some unknown quantity of the surface; he opined that "you could safely figure 100 ton per inch, per acre, would be mineable * * *." He admitted that there is no deep mining in the area, although it was shown that seams of about five inches in thickness lie some 60 to 70 feet below the surface. The weakness of this testimony is obvious.

We think no more need be said. The verdict is so clearly excessive as to appear, at first blush, to have been given under the influence of passion or prejudice, in disregard of the evidence and instructions of the court. CR 59.01(4). Neither is the verdict supported by evidence containing probative value of the quantum required. See Com., Dept. of Highways v. Gearheart, Ky., 383 S.W.2d 922; Com., Dept. of Highways v. Lyons, Ky., 364 S.W. 2d 336; Com., Dept. of Highways v. Rankin, Ky., 346 S.W.2d 714, and the authorities therein cited and discussed. Accordingly, we must reverse the case on the grounds stated.

Since there likely will be another trial, we briefly discuss the other matters presented. Neither the minerals or timber should be valued separately. Com., Dept. of Highways v. Cardinal Hills Nursery, Ky., 380 S.W.2d 249; Gulf Interstate Gas Co. v. Garvin, Ky., 368 S.W.2d 309.

With respect to the instructions upon a new trial, the court will be guided by the rule set forth in Com., Dept. of Highways v. Priest, Ky., 387 S.W.2d 302 (decided November 20, 1964).

The judgment is reversed for proceedings consistent with the opinion.