**PAINTSVILLE–PRESTONSBURG AIR-PORT BOARD, Appellant,**

**v.**

**Douglas GALBRAITH et al., Appellees.**

Court of Appeals of Kentucky.

June 7, 1968.

Rehearing Denied Dec. 13, 1968.

W. A. Johnson, Paintsville, Clifford B. Latta, Prestonsburg, for appellant.

Reed Anderson, Dan Jack Combs, Pikeville, Joe Hobson, Prestonsburg, for appellees.

Robert Matthews, Atty. Gen., Frankfort, Amicus Curiae.

OSBORNE, Judge.

This proceeding was brought by the Paintsville-Prestonsburg Airport Board to condemn approximately 22.70 acres of land which is a portion of five different tracts belonging to four different owners. The land lies between the Levisa fork of the Big Sandy River and the cliffs adjoining the river. It is a rather flat section historically known as Block House Bottom. The locale enjoys notoriety in the eastern section of this state because it is reputed to be the spot first inhabited by white man in the mountainous eastern section and the spot to which Jenny Wiley returned after being captured by Indians. It lies almost directly across the river from the community of Auxier, approximately halfway between Prestonsburg and Paintsville.

The before and after acreages, the jury's verdict and
the commissioner's awards are set out in the chart below

| NAME | Before Acres* | Remaining Acres | Taken Acres* | Commissioner's award | Jury's Before Value | Jury's After Value | Jury's Verdict |
|---|---|---|---|---|---|---|---|
| Douglas Galbraith et al-tract #1 | 37.74 | 32.80 | 4.94 | $5467.50 | $121,215 | $9840 | $111375 |
| Henry Burke tract-#2 | 25.01 | 15.44 | 9.57 | $11291.50 | 87,535 | 4632 | 82903 |
| Henry Burke tract-#8 | 5.01 | 2.90 | 2.11 | | 14,210 | 369 | 13841 |
| John B. Auxier et al-tract #4 | 9.74 | 5.70 | 4.04 | 6683.00 | 37,920 | 1710 | 36210 |
| Polk Auxier tract-#6 | 4.24 | 2.20 | 2.04 | 1683.00 | 14,840 | 660 | 14180 |
| TOTAL | 81.74 | 59.40 | 22.70 | $25,125.00 | $275,720 | $17,211 | $258,509 |

*Appellee's figures

At the time of the taking by the Airport Board, there was then in progress the construction of U. S. Highway 23 which was being relocated from the west to the east side of the river along the foot of the bluffs. Prior to the relocation of the highway, the tract was extremely inaccessible and of minimal value. The owners now contend that because of the relocation of Highway 23, the property will in the immediate future become desirable as a subdivision site, and therefore its present value is greatly increased.[1] The Board contends that as Highway 23 had not been constructed at the time of the taking, the airport and the highway project should be viewed as simultaneous takings and the recovery of the landowners should be limited to the value of their property prior to the announcement of the relocation of Highway 23. They also contend the proof is not sufficient to show that the present highest and

1. The landowners do not contend nor show that there is any joint effort upon their part to consolidate the property into one large subdivision. Their argument assumes that this is possible.

best use of the property is for subdivision purposes nor that there is an immediate market for subdivision lots in the vicinity; therefore, the awards of the jury should be reversed.

■ We do not believe that it will be necessary to come to the question of simultaneous taking as we are convinced that there was a failure to show the highest and best use of the property at the time of the taking was for subdivision purposes, therefore the verdict of the jury being clearly based upon the value of the land for subdivision purposes, will have to be set aside as excessive. We have no way of knowing whether the question of simultaneous taking will become a problem on the next trial of the case and for this reason we think it best not to pass upon it here and to reserve it for a possible future appeal.

The property lies in Johnson County which is a mountainous county with a population of slightly over 19,000. It is located approximately halfway between Prestonsburg and Paintsville, which have populations, respectively, of approximately 3000 and 4000. The property is located approximately six miles from each community. A plat filed by the landowners shows the property subdivided into approximately 476 lots. In evaluating the property the landowners' witnesses assumed that there is a market and an immediate demand for these lots in the community. This contention was strongly controverted by the Commonwealth during the course of the trial. Several witnesses touched upon the subject. O. S. Batten testified that in his opinion there was a demand for building property within the area because of the growing economy. He stated, "The future, the best part of the valley is in front of us not behind us from an economical standpoint." He further testified that there is now a demand for subdivision and residential development in Johnson County. However, on cross-examination, he qualified this by stating that these demands are something that "will exist" in the future.

Mrs. Galbraith, one of the owners, testified that in her opinion there was presently a demand for building lots in the area, but on cross-examination admitted that she lived in a subdivision in Paintsville where only five or six lots had been sold from a twenty-lot subdivision over a period of several years.

Mitchell Preston, a contractor from Paintsville, testified that there was presently some demand for residential property in the area but that in his opinion there was not a demand for an entire project of this size at the present time. When asked how long it would take for the demand to develop, he stated, "Well, I would say if everything worked out the way everybody hopes for, in the next two or three years."

Dr. Turner, a member of the Airport Board, testified that the population of the area had been decreasing and that he did not think there would be much market for a subdivision at that time. He was asked, "In your opinion is there any demand for subdivision property up in the vicinity of Block House Bottom?" His answer was, "I wouldn't know. I don't think there is. The way the population has been decreasing in the area and I don't think there will be much market for a subdivision any place down here."

O. T. Dorton, President of the Citizens National Bank of Paintsville and a member of the Airport Board, testified that in his opinion there was little demand for subdivision property even in the city of Paintsville. He was asked, "In your opinion has there or is there any demand for subdivision property in this area?" And, his answer was, "We have a subdivision which has been moving rather slowly (Richmond Addition) so it would indicate that at the particular moment, there is no great demand for subdivision property."

B. E. Mullins, an attorney and chief counsel for the First Federal Savings and Loan Association in Paintsville, was asked, "Now what demand if any do you know of is there for subdivision property in and

around Paintsville as of January 14, 1963?" His answer, "Well, there is always, of course, people that are building homes, but as to subdivision it is, that is, that you build several houses, sell a lot or lots and build it up, there is no great demand for it."

In view of the fact that the area proposed to be subdivided is approximately as large as the entire city of Paintsville, Pikeville or Prestonsburg, lies six miles from the nearest incorporated town of any size, and was not at the time of the taking serviced by a public road, we do not believe the proof shows the highest and best use to be anything other than agriculture.

In Commonwealth, Department of Highways v. Gearhart, Ky., 383 S.W.2d 922, we recognized that evidence can be adduced that the highest and best use might be something other than the present use but in order for this to be true there must be an expectation or probability that in the *near future* it will be so used. Evidence of this nature was admitted in Bowling Green-Warren County Airport Board v. Long, Ky., 364 S.W.2d 167. However there even though the court considered testimony as to its suitability as subdivision property, the total award was only $800 per acre which would not have been excessive for top-grade farm land. In Commonwealth of Kentucky, Dept. of Highways v. Riley, Ky., 388 S.W.2d 128, we said, "The valuation which controls is the value at the time of the taking—in this case, as residential or farm property unless it can be shown that it is transitional property reasonably expected to *soon* (emphasis added) be used as business property."

Again, in Commonwealth of Kentucky, Dept. of Highways v. Creason, Ky., 402 S.W.2d 426, we recognized the problem and stated the rule as follows:

"This case presents an acute example of the omnipresent conflict between efforts to indemnify the landowner for the loss of the potential value of his property for possibly more remunerative uses such as residential development or industrial development, and the necessity of measuring the condemnation value in terms of the value of the property at the time of the taking—the so-called fair market value. To hold land for accretion in value is a recognized practice just as much as investing in common stocks, but the significant thing is that investment in both is subject to the forces of the market including the effects of governmental controls. It would seem fair, therefore, in condemnation cases to value the land taken on the basis of its use at the time of the taking unless it can be shown that an expectation or probability of residential or commercial uses in the *near future* (emphasis added) can be shown. Commonwealth of Kentucky, Department of Highways v. Robinette (1965), Ky., 386 S.W.2d 719; Commonwealth of Kentucky, Department of Highways v. Gearhart (1964), supra. In the case at bar that was not shown, so the testimony as to the value of the property for residential or industrial purposes was not justified, and confused or misled the jury in reaching a verdict."

See Commonwealth of Kentucky, Department of Highways v. Doolin, Ky., 411 S.W. 2d 44 and Commonwealth of Kentucky, Department of Highways v. Stocker, Ky., 423 S.W.2d 510.

Even though there is a possibility that a portion of this tract may someday be developed for residential purposes, we believe the proof herein is not sufficient to establish that this is imminent or will come in the near future. The measure of compensation to which the landowner is entitled is the market value of the land, taking into consideration its value for building purposes. If that is its highest and best use the fact that there are no buildings on the land at the time of the taking will not in itself make such potential use speculative or remote as a matter of law. However, if the possibility for building purposes is remote and speculative this will render any evidence of such use inadmissible. 4 Nichols, On Eminent Domain, 3rd Ed., §

12.3142; Commonwealth of Kentucky, Department of Highways v. Gearhart, supra; Commonwealth of Kentucky, Department of Highways v. Oliver, Ky., 385 S.W.2d 173; Commonwealth of Kentucky, Department of Highways v. Doolin, supra; Commonwealth of Kentucky, Department of Highways v. Brumfield, Ky., 418 S.W.2d 231.

In view of the remoteness of this property from a city and the present lack of demand for this type of property in the locality, we are of the opinion that its future use as a subdivision is at present speculative to say the least. Testimony as to its value for subdivision purposes should have been excluded.

The judgment is reversed.

WILLIAMS, C. J., and MONTGOMERY and STEINFELD, JJ., concur.

MILLIKEN and PALMORE, JJ., dissent.

HILL, J., not sitting.

PALMORE, Judge (dissenting).

Relocation of U.S. Highway 23 (the main highway through the Big Sandy Valley) from the west to the east side of the Big Sandy River naturally enhanced the value of the property fronting on the new right-of-way. The highway taking preceded the airport taking, and the condemning authorities were different, so it seems to me that there can be no question of the right of the landowners in this proceeding to be paid on the basis of the enhanced value. As the majority opinion says, the land in question is about half way between Prestonsburg and Paintsville. It also is near the entrance to Jenny Wiley State Park. Except for the Galbraith tract, the airport takes all the frontage and leaves the remainder parcels along the river bank with no access to the highway except by sufferance of the airport board (so far as the record indicates,

there has been no conveyance of an access easement). Highly qualified expert witnesses testified that immediately prior to the airport taking all of this property was adaptable to and saleable for purposes of residential subdivision, with a market value from $3000 to $4000 per acre, and that the remainder portion lying between the airport and the river, now usable only for farming, is worth about $300 per acre. A 40-acre tract on which Prestonsburg Community College is located, on the north side of Prestonsburg, sold for $4,000 per acre. There simply is no basis on which I can conscientiously vote to exclude and disregard the testimony of those witnesses.

The Galbraith tract has not been cut off. It still has extensive frontage on the highway. Assuming that the other awards were not inadequate, there is reason to hold the Galbraith award excessive, and I concur in the result as to that particular tract. With respect to the others I must dissent.

MILLIKEN, J., joins in this dissenting opinion.