**COMMONWEALTH of Kentucky, DEPART-MENT OF HIGHWAYS, Appellant,**

v.

**MELWOOD DEVELOPMENT, INC., et al., Appellees.**

Court of Appeals of Kentucky.

Dec. 1, 1972.

———◆———

Lester King, pro se.

Ed W. Hancock, Atty. Gen., James M. Ringo, Asst. Atty. Gen., Frankfort, for appellee.

Don Duff, Department of Highways, Frankfort, George B. Baker, Jr., Rhoads & Baker, Henderson, Harvey G. Ershig, Madisonville, for appellant.

William M. Deep, King, Deep, Branaman & Hunt, John L. Dorsey, Jr., Dorsey, Sullivan & King, Henderson, for appellees.

CULLEN, Commissioner.

The Commonwealth of Kentucky, Department of Highways, condemned for highway purposes 20.36 acres out of a 41.-84-acre parcel of land lying within the city limits of Henderson, Kentucky, and owned by Melwood Development, Inc. The major portion of the acreage taken was for the construction of an interchange connecting U.S. Highway No. 41 and Kentucky Highway No. 54 with a new super-highway to be known as Pennyrile Parkway. The other portion taken was for an access road for an adjacent subdivision which was being landlocked by the construction of the new parkway.

The verdict and judgment fixed the damages for the taking at $302,500. On this appeal by the Department of Highways from that judgment the primary contention is that the damages are excessive.

The 41.84-acre parcel originally was part of a 57-acre tract owned by one Cooper. In 1952 or 1953 a plat of that tract was prepared, laying off streets and dividing the area into residential lots. The plat was approved by FHA but was never recorded in the office of the county court clerk for conveyance purposes. In 1955, the predecessor of Melwood Development obtained from Cooper an option to buy the 57-acre tract, in parcels, over a period of years, at a price of $2,000 per acre. That option was exercised, initially in part by Melwood's predecessor and eventually from time to time by Melwood, between 1956

and 1966, and in the latter year Melwood completed acquisition of title to the entire tract. In the meantime, in 1959, active subdivision development was begun, following the design of the 1953 plat. At the northern end of the tract, four blocks, containing 53 lots, were dedicated by a recorded plat. Sewers and water lines also were run into the tract, from the southwest corner, and extended along the lines of the platted streets in the northern portion of the tract. Subsequently, 39 of the lots that were platted in 1959, constituting some 16 acres, were sold, and that area is not involved in the condemnation suit. Also in 1962, a one-half acre parcel near the northeast corner of the tract was sold to an adjoining owner for commercial use. Fourteen of the lots platted in 1959 remained unsold at the time of the condemnation, and were part of the 41.84-acre parcel from which the condemned land was taken. In 1966, three additional blocks, containing 25 lots, adjoining the previously platted blocks and conforming to the design of the 1953 plat were dedicated by recorded plat.

The result was that when the condemnation was instituted in 1966, there were, in the 41.84-acre parcel, 39 lots dedicated by formal plat. In addition, according to the design of the 1953 FHA plat, there were 91 potential lots. Eight of the dedicated lots were fully developed, on paved streets with water and sewer facilities. Another 17 of those lots were fully developed also, except that the street on which they fronted had not been paved. The lines of the streets called for in the 1953 plat had been followed, in the undedicated area, in running the sewer and water lines into the dedicated area. The dedicated area embraced around 12 acres of the 41.84-acre parcel.

In the area where the Melwood tract was located, U.S. Highway No. 41 runs north and south. On the east side of that highway the land abutting the highway consists of a number of parcels under separate ownerships, devoted to commercial uses, and having a depth of around 90 feet. The west line of the Melwood tract, which was the back or east line of those commercial parcels, ran parallel with U.S. Highway No. 41 for 1100 to 1200 feet. The Melwood tract was roughly square in shape.

At the north end of the Melwood tract there was a platted street entering into U.S. Highway No. 41. The Melwood corporation also owned rights for two other entrances to that highway at points where streets were laid out in the 1953 FHA plat. In addition, there was an entrance from one of the dedicated streets in the Melwood tract to Kentucky Highway No. 54 on the east of the tract.

The witnesses for the landowners placed the "before" value of the Melwood tract at approximately $400,000, and the "after" value at from $40,000 to $68,000, making their average of damages around $346,000. The jury fixed the "before" value at $390,000 and the "after" value at $87,500, making the damages $302,500. The "after" value was within the range of the testimony because the witnesses for the Department of Highways placed the "after" value as high as $94,500.

As we view the case, the controlling question as concerns excessiveness of the damages is whether the evidence supports the jury's finding of such a substantial diminution in value of the tract by reason of the condemnation. In our opinion, as will be developed hereinafter, the evidence fully sustained the finding of the "before" value; the question is whether the evidence sustained the finding of such a low "after" value. In other words, did the evidence establish that the portion of the tract that remained after the taking did not have substantially the same value factors that it had before the taking?

The evidence for the landowner was that approximately 10 acres in the eastern and southern parts of the Melwood tract were best usable for commercial purposes, had a market for such use, and although only a

little more than two of the acres was zoned for commercial use it was probable that an application to rezone the remaining 8 acres for commercial use would be granted. Testimony as to allegedly comparable sales of land for commercial use would indicate a value as high as $18,000 to $20,000 per acre. This would suggest a value of from $180,000 to $200,000 for the 10 acres of commercial land in the Melwood tract. The testimony was that the highest and best use of the remaining 30 acres of the Melwood tract was for residential lots. The witnesses for the landowners in effect valued those 30 acres at $200,000 to $220,000, in doing which they gave recognition to the fact that some of the land was not yet dedicated, some was dedicated but not yet fully developed, and some was fully or almost fully developed. We can find no basis for discounting the probative value of that testimony. Thus, the jury's finding of a "before" value of $390,000 had support in the evidence.

The factors that the landowner's witnesses gave in reaching their "after" values were as hereinafter stated. First, the remaining tract had no commercial value. Second, the ramps for the interchange, rising to 20 feet in height, on the land condemned, will adversely affect the value of the adjacent land for residential use. Third, the taking will cut off some of the existing and planned streets of the subdivision, requiring the redesign of the plat, the relocation of existing streets, and the acquisition of new entrances to the highways. This in turn may require the relocating of sewers and water mains laid under the existing and planned streets. Fourth, the tract after the condemnation will not have sufficient access to the highway system, without the acquisition of new entrances, to meet subdivision regulations, and therefore was deprived of reasonable access for the purposes to which the land was being devoted. Fifth, the construction of the ramps will adversely affect the drainage of the tract. Sixth, in the construction of the access road for the adjacent property, over the right of way condemned for that purpose, the grade will be raised some two feet above the level of the adjoining platted lots, thus depreciating their value. Seventh, a number of the lots as planned were cut in half by the taking, thus requiring a redesign of the plats and causing a reduction in the number of lots.

It is our opinion that the stated factors justify the low "after" value found by the jury.

Our conclusion is that the damages are not excessive.

The Department of Highways makes three complaints of improper admissions of evidence, and one of improper rejection of evidence.

■ The landowner was permitted to introduce evidence that before the condemnation a shopping-center developer had taken an option on two acres of the Melwood tract, along with an adjoining tract, for a shopping-center development, but that the option was not exercised because the developer could not obtain a definite commitment from the Department of Highways as to its plans for highway construction in the area. The option *price* was not given in evidence, and the trial court admonished the jury that the evidence concerning the option was competent only "for the purposes of showing the adaptability of this property for commercial purposes, if it does so show it to be adaptable."

The Department of Highways argues that the evidence as to the option showed merely a *hope* of commercial development, or at the most a very limited potential of commercial use solely in conjunction with the adjoining tract, and did not show a probability that the highest and best use of part of the Melwood tract was for commercial purposes, but only that a particular developer thought it possibly might suit his purposes. It is our opinion, however, that the evidence had probative force to establish the commercial potential of the land in

question. The developer corporation was a large operator, having 37 centers in operation. Its operational head testified as to the comprehensive survey made of the proposed development involving the Melwood parcel, and he further testified as a qualified expert that in his opinion the highest and best use of the parcel in question was for commercial purposes.

The department argues further that the evidence as to the unexercised option was the equivalent of evidence of damages from a frustrated contract. The argument is not valid because the option *price* was not shown so there was no effort to show damages.

■ The department complains of error in the admission of evidence that an oil and gas company, which owned a lot fronting on U.S. Highway No. 41 and running back to the Melwood tract, bought a 0.41-acre parcel of the Melwood tract in 1962, to enlarge its lot, for $7,500. The department maintains that this was not a *voluntary* sale, as the oil and gas company had no choice, in enlarging its lot, except to buy part of the Melwood tract. We think the argument is not valid. Any owner of land, anywhere, who wishes to expand the area of his holding, is limited to buying land from adjoining owners. That does not mean that when he does buy from one of those owners his purchase is not voluntary. There is no showing in the evidence that the oil and gas company was *compelled* to buy the parcel from the Melwood tract. The parcel in question was zoned for commercial use, and there was testimony that it could have been separately developed commercially. There further was testimony that other owners of lots fronting on U.S. Highway No. 41 had indicated the desire to buy portions of the Melwood tract to expand their commercial lots. It is our opinion that there was no error in the admission of the evidence.

■ Witnesses for the landowners were permitted to use, as comparable sales, the sale of lots in the initially developed

part of the Melwood land, to the north of the area involved in the condemnation. The Department of Highways argues that the sales were not comparable because the sold lots had been fully developed whereas most of the lots in the tract involved in the condemnation had not been developed and many of the proposed lots had not even been platted. However, as hereinbefore stated, eight of the lots in the tract in question were fully developed and 17 more lacked full development only in that the street on which they fronted had not been paved. So the sales were comparable as to those lots. The department argues further that when the witnesses for the landowner were allowed first to testify as to the total number of lots platted or planned for the Melwood tract, and then to testify as to sale prices of developed lots in the initial part of the subdivision, the practical effect was to allow the witnesses to put a per-lot value on the undeveloped lots in the condemnation area, which this court has condemned in such cases as Commonwealth, Department of Highways v. Evans, Ky., 361 S.W.2d 766. We are not so persuaded. The witnesses did not purport to put a per-lot value on the condemned land, and they expressly denied that they had used per-lot values in reaching their overall "before" values. Their testimony indicated that they had assigned different values to the developed lots from the values assigned to the undeveloped and unplatted portions of the Melwood tract.

■ The final contention of the Department of Highways is that the trial court erred in refusing to admit evidence offered by the department that Melwood Development had paid a price of only $2,000 per acre for the tract in question in exercising its option to buy the tract from the original owner, Cooper. As hereinbefore stated, the option contract was entered into, and the per-acre price was fixed, in 1955, but the option was exercised, as to various portions of the tract, over the period from 1956 to 1966. The trial court ruled that evidence as to any *sales* made more

than five years prior to the condemnation would not be admissible, as too remote, and held that the acquisitions from Cooper were in effect one sale, made in 1955. The department argues that those exercises of the option that were made in the five years prior to the condemnation were *sales* made within that period, and should have been admitted in evidence. The argument is not valid. The *price* was what the department wanted to get in evidence, and that was fixed in 1955. That is when the sale took place as far as the price was concerned. It is true that the *buyer* had a choice whether or not to exercise the option at later times, and to that extent he was a voluntary purchaser at the option price each time he exercised the option, but the seller had no choice and he was in the position of a voluntary seller only when the option contract was made, in 1955.

The judgment is affirmed.

All concur.