**BIG RIVERS ELECTRIC CORPORATION,**
Appellant,

v.

**Lyman P. BARNES and Joyce M. Barnes, Appellees.**

**No. 2002–CA–001164–MR.**

Court of Appeals of Kentucky.

April 2, 2004.

Discretionary Review Denied by Supreme Court Nov. 10, 2004.

Frank Stainback, Owensboro, KY, for appellant.

E.F. Martin, Jr., Hartford, KY, for appellees.

Before BARBER, SCHRODER, and TACKETT, Judges.

## OPINION

SCHRODER, Judge.

The Big Rivers Electric Corporation (Big Rivers) appeals a jury award of damages for the acquisition of an electric transmission line easement, and for damages awarded for a temporary trespass where the after-built survey disclosed an unauthorized tower and lines strung outside the easement. The jury's award of damages for the taking properly considered the coal reserves. However, the repeated injection of the third-party offer to purchase was so prejudicial as to warrant a mistrial. On retrial, the missing owners of the mineral estate must be addressed. We also disagree with allowing the jury to award separate trespass damages where the condemnation suit was amended to include the land taken through inverse condemnation. We therefore affirm in part, reverse in part, and remand.

Lyman P. Barnes and Joyce M. Barnes (the Barneses) purchased a 218–acre farm along the Green River in Ohio County (adjacent to Muhlenburg County) in 1955 (and eventually purchased nine-sixteenths of the mineral estate). Big Rivers sought an easement 100 feet wide and 3,213.67 feet long across the farm for the erection of three electrical towers and the stringing of wires to pass through the farm (next to and parallel to a similar KU easement). Big Rivers's easement contained 7.275 acres.

After receiving an interlocutory ruling of their right to condemn, Big Rivers proceeded to build the towers and string the electrical lines. A survey made after the improvements were made revealed a fourth tower had been erected (originally designated for adjacent property), and some guy wires were erected outside the original easement area. Big Rivers was granted leave to amend its condemnation petition to include the additional structure

and the additional area. The interlocutory judgment was amended accordingly. A jury trial was held to determine the trespass damages for the taking and damages for the 26 months between the time the fourth structure was built and the entry of the amended interlocutory judgment. The jury awarded $67,000.00 for the taking of the (amended) easement and $138,000.00 for the 26–month trespass.

■ On appeal, Big Rivers argues that it was error to allow the Barneses to recover damages for the temporary trespass. We agree. Even though Big Rivers took the land before it was allowed or authorized by the interlocutory judgment, *Witbeck v. Big Rivers Rural Electric Cooperative Corp.*, Ky., 412 S.W.2d 265 (1967), *overruled on other grounds by Commonwealth, Dept. of Highways v. Stephens Estate*, Ky., 502 S.W.2d 71, 73 (1973), holds the exclusive remedy of the landowner is:

> [t]hat where an entity possessing the power of eminent domain prematurely enters upon the premises of the condemnee, the exclusive remedy of the landowners is based on Kentucky Constitution, Section 242, which provides that "just compensation for property taken" shall be made. This remedy is frequently referred to as "reverse condemnation." The measure of damages is the same as in condemnation cases.

*Witbeck*, 412 S.W.2d at 269 (citations omitted). The Barneses try to distinguish *Witbeck* from the case sub judice on the fact that in *Witbeck*, the entry was only two or three days early whereas in this case the entry was 26 months earlier. We see no such distinction and the Barneses cite no authority for a different legal result. The fact important to us is that the land was eventually taken through condemnation, and not merely temporarily trespassed upon as in an off right-of-way case.[1]

Because the Barneses are entitled to a single award based on the diminution in market value, it is necessary to reverse and remand the award for trespass ($138,-000.00). Also, Big Rivers's arguments concerning the temporary trespass (B, C, and D) become moot and there is no further need to discuss temporary trespass damages.

The remaining issues have to do with the jury verdict of $67,000.00 for the taking. KRS 416.660(1) sets the standard for damages in condemnation cases as "the difference between the fair market value of the entire tract … immediately before the taking and the fair market value of the remainder thereof immediately after the taking. . . ." From *Commonwealth, Dept. of Highways v. Tyree*, Ky., 365 S.W.2d 472, 477 (1963), we learn that "[t]he proper measure of damages, where part of a tract of land is taken by condemnation, is the difference in the fair market value of the tract before and after the taking." Where the land contains minerals, "the quality and quantity of the minerals may be properly considered as *affecting the market value of the land* but they *cannot be valued separately.*" *Gulf Interstate Gas Co. v. Garvin*, Ky., 368 S.W.2d 309, 311 (1963). Big Rivers refers to this as "price tagging". *See Commonwealth, Dept. of Highways v. Mann*, Ky., 387 S.W.2d 848, 850 (1965), which held the testimony of the difference in market value should be stricken where a witness arrives at an "after" value by itemizing various damage factors and subtracting the total from the "before" figure. (Price tagging formula.) Price tagging, figuring "the worth of the coal and timber in determining the values of the land" was disapproved and the expert's testimony stricken in *Common-*

---

**1.** Their equity may be in the 26 months of interest on the taking price.

*wealth, Dept. of Highways v. Davis,* Ky., 400 S.W.2d 515, 516 (1966). *See also, Commonwealth, Dept. of Highways v. Creason,* Ky., 402 S.W.2d 426, 427 (1966), on the disapproval of price tagging of trees, springs, barns, etc. *See also, Witbeck,* Ky., 412 S.W.2d at 268.

 On appeal, Big Rivers argues that the court erred in allowing a witness, Mr. Pritchett, to testify to before and after values because his values: were based upon the value of the minerals in place (coal seams); ignored sales of similar property; and used an income approach that valued only the mineral estate and price tagged it. Big Rivers is partially correct. *Tyree* recognized that property values are not susceptible to exact measurements so expert opinions may be used. *Tyree* made a distinction between the opinion evidence and specific determinable facts relied on to formulate an opinion as to the difference in the market value before the taking and after the taking. For example, in the case sub judice, the amount of coal reserves is a determinable fact whereas the feasibility of mining said coal is an opinion. The difficulty in condemnation cases is "to distinguish clearly between *competency* or *relevancy* of evidence and its *probative value.*" *Tyree,* 365 S.W.2d at 475. As to *probative value* "[t]his court has said that the opinion of a witness that property is worth a stated amount is 'worthless' unless the witness gives 'facts as a reasonable basis to support his opinion.'" *Id.* at 477 (citation omitted). "[I]t is not necessary for a witness to give 'supporting facts' in order to make his estimate of values *admissible;* the lack of supporting facts affects only the extent to which the probative value of the estimate will go." *Id.* The court went on to conclude "that the various elements and factors of damage that may be involved are not *items of damage* to be

priced and totaled ... but are only reasons to be given in support of opinion testimony of before and after values[.]" *Id.* at 477–478. *Commonwealth, Dept. of Highways v. Gearhart,* Ky., 383 S.W.2d 922 (1964), also recognized that coal deposits may be considered apart from the surface use, with qualifications. The market value of land is determined by its use, or "the adaptability ... for particular uses, even though the property is not then being so used." *Gearhart,* 383 S.W.2d at 926. The adaptability concept has become known as the "highest and best use". *Galbraith v. Winn,* Ky., 459 S.W.2d 153 (1970).

 The "highest and best use" has qualifications. "[T]here must be an expectation or probability in the *near future* that it can or will be so used." *Gearhart,* 383 S.W.2d at 926 (emphasis added). The property must not only be *available* for a future use but there must be a *reasonable expectation* that it will be so used. *Commonwealth, Dept. of Highways v. Riley,* Ky., 388 S.W.2d 128, 129 (1965). When coal reserves are involved as a factor, not only must the amount of coal be considered, but whether "the coal could be mined and marketed in the foreseeable future." *Commonwealth, Dept. of Highways v. Callihan,* Ky., 391 S.W.2d 374, 375 (1965). In condemnation cases, the value of the land taken is based on "its use at the time of the taking *unless* it can be shown that an expectation or probability of ... uses in the *near* future can be shown." *Creason,* 402 S.W.2d at 427 (emphasis added). In determining the market value of land, we look to "the highest and best use of the property at the time of the taking...." *Paintsville–Prestonsburg Airport Board v. Galbraith,* Ky., 433 S.W.2d 868, 870 (1968). "[W]e recognize[ ] that evidence can be adduced that the highest and best use might be something other than the present

use but in order for this to be true there must be an expectation or probability in the *near future* it will be so used." *Id.* at 871. *See also, Commonwealth, Dept. of Highways v. Carraco,* Ky., 476 S.W.2d 175 (1972); *Commonwealth, Dept. of Highways v. Melwood Development, Inc.,* Ky., 487 S.W.2d 684 (1972); *Stephens Estate,* 502 S.W.2d 71.

We reviewed the testimony of Mr. Pritchett, one of the expert witnesses for the Barneses. He has 25 years experience as an appraiser, and is certified in both Kentucky and Tennessee. Twenty-five percent of his time or work experience was appraising coal reserves or property in Western Kentucky. After the trial court determined he was competent to testify as an expert on real estate values, Mr. Pritchett explained how he arrived at the $67,000.00 difference between the fair market value before the taking and the fair market value after the taking. He first visited the property and walked around with Mr. Barnes who gave him a history of the use, the location of the easement, and notice of the prior drillings that established the presence of coal underground. He also visited the PVA's office, looked at comparable sales, and obtained topographical maps with the coal reserves on this particular piece of property. Mr. Barnes also informed him of Peabody Coal's reserves and ownerships in the area. Mr. Pritchett is not an engineer but relied on the report of recoverable coal from Keith Biggerstaff, an engineer.

Once Mr. Pritchett knew what was on the property and in the area, he determined the highest and best use of the property was as a medium to long term coal reserve. On cross, he acknowledged that the present and past use was agricultural but opined that on the date of taking, the highest and best use was not farming, but as a medium to long term coal reserve.

When asked if the "highest and best use" should exclude "remote, speculative, or conjecture", he disagreed. As a coal reserve, he gave a present value based on the tonnage of the minerals recoverable at a future date, ten, fifteen, or even twenty years from now. After concluding the highest and best use was a medium to long term coal reserve, Mr. Pritchett applied his appraisal process to arrive at value, which process has three approaches: sales, cost, and income.

He first looked at comparable sales of coal reserve property and found none. He was aware the area currently supported agricultural uses, and that similar farms in the area were selling from between $500.00 to $1,400.00 an acre. However, he was unaware of the coal reserves in those properties and opined that it would not be proper to compare similar sales where there were no coal reserves. "Comparable sales are helpful in determining value but other methods may be used." *Commonwealth, Dept. of Highways v. Sellers,* Ky., 421 S.W.2d 581, 584 (1967).

Next, Mr. Pritchett attempted to use the cost approach which (he described) would take the cost of purchasing the mineral rights and add the additional costs of the improvements, less depreciation of the improvements. Again, he found this approach did not apply because the land was not being developed as a coal mine.

Last was the income approach. He opined that the income approach was the best method for coal investment property. This approach recognizes that there may not yet be income from the coal reserves, but that there is a current value for coal reserves that may be developed in ten, fifteen, or twenty years. The date of mining or recovery would depend upon the amount of coal in the reserve, the overburden (how deep one must dig), and the market. He acknowledged that there was

twice the probability that it would be fifteen to twenty years rather than ten years before this particular property would be ready to be mined. He noted that Peabody Coal has taken core samplings. Peabody owns the adjacent property and most of the coal in the "boot" area of which the Barneses' is a part. He also opined that once coal reached $25.00 [2] a ton, surface mining would be feasible with a twenty cent royalty split evenly between the surface owner and the mineral owners. Using the "recoverable coal" [3] estimates from the Biggerstaff (engineer/surveyor) report, times the royalty, and discounting the future income for the time waiting to mine, he estimated the present value would be less than ten cents on the dollar of future sales. Mr. Pritchett then concluded that the present value of the coal reserves before the taking was $742,000.00, and the value after the taking was $675,000.00, for a difference of $67,000.00.

George K. Cox testified on behalf of Big Rivers as to the "highest and best use" of the Barneses' property. Mr. Cox is a real estate appraiser and consultant, certified as an appraiser in both Kentucky and Indiana, as well as a licensed broker in both states. He was hired by Big Rivers to evaluate the Barneses' fair market value before and after the taking, including any effect of the additional two-tenths of an acre added to the amended complaint for the extra electrical tower. Mr. Cox also visited the Barneses' property, talked with Mr. Barnes, inspected the Kentucky Utilities easement, reviewed the rights associated with it, obtained information relative to crop production, researched records for local sales, reviewed the opinions of Engineer Scott Vaughan, reviewed various depositions, made inquiries concerning farm rentals, and analyzed the data obtained from market research.

Mr. Cox explained the three classic approaches to determining fair market value: the cost approach, the income approach, and the sales comparison approach. In this case, Mr. Cox relied upon the sales comparison approach to determine the fair market value of the Barneses' property before and after the imposition of the Big Rivers easement. He used the sales comparison approach because he could obtain more data, both quality and quantity, using the sales comparison approach than he could if he used the income approach or the cost approach. In his opinion, the highest and best use of the Barneses' property before and after Big Rivers acquired its easement was as a farm. He based his opinion upon the neighborhood, land use in the area, availability of utilities in the area, availability of the roads, flooding, sales of similar properties, and, perhaps most importantly, the present and past use of the Barneses' property as a farm. In Mr. Cox's opinion, the fair market value as a farm immediately prior to the taking was $225,000.00 or $1,032.00 per acre and $218,500.00 or $1,002.00 per acre, immediately after the taking, for a difference of $6,500.00.

**2.** Coal was at $16.00 plus at the time of taking per Pritchett.

**3.** In identifying the "recoverable" coal, Mr. Pritchett relied on the Biggerstaff report (an engineer). Said report acknowledged the taking under the easement was 7.22 acres with 94,221 tons of coal. However, the report also noted that an additional 17.67 acres of coal would be unrecoverable because it was in a strip between the easement and the Green River. The total unrecoverable acreage then jumps to 24.84 acres or 324,162 tons. On cross, it was pointed out that the KU easement already cut off land between the easement and the Green River. Mr. Pritchett could not say if this was considered by Biggerstaff in his total estimate of recoverable coal, but Mr. Pritchett thought those power lines could be moved.

Scott Vaughan is a consulting engineer and surveyor from the area. He does civil and mining consultant work, including coal reserve studies and general mine planning. He has worked for every company that operated in Western Kentucky in the last twenty years with one or two exceptions. He reviewed the "Loss of Coal Resources" prepared by Keith Biggerstaff, also an engineer and surveyor. This report calculates the number 11, 10, and 9 coal seams into total coal available and total coal recoverable. This report was relied on by Mr. Pritchett, who is not an engineer. This report does not give a timetable or method for recovery but simply shows the coal reserves.

Scott Vaughan prepared a report (exhibit 13) on the *mineability* of coal seams 11, 10, and 9 on the Barneses' property. He did not disagree with the Biggerstaff conclusions concerning the amount of coal in the seams under the Barneses' property, but disagreed with Mr. Pritchett's idea to surface mine the seams. Seam number 11 is about 2.6 feet or 31 inches thick with about 113 feet of overburden. Seam number 10 is 1.8 feet or 22 inches thick and about 140 feet deep. Seam number 9 is 4.3 feet or 52 inches thick, with anywhere between 213 to over 300 feet of overburden. As to mineability, Mr. Vaughan stated that only in recent years has seam number 10 been mined by one company in the area for its coal, that previously the number 9 seam was the one companies studied for mining. In order to surface mine, both state and federal regulations would have to be followed which would put the recoverable coal *outside* the area taken for the easement. Also, he opined that the coal was too deep for surface mining. Mr. Vaughan gave his professional opinion that a surface mine could only be 100 to 120 feet deep with mobile equipment and a drag line. Sometimes, temporarily, a surface mine could go 180 feet deep. He

opined this land should only be considered for deep mining and that there was no other mining in the "boot" area where the Barneses' property was located. He did not see a deep mine in the near future.

■ Mr. Pritchett's opinion of the Barneses' property as a medium to long term coal reserve is not disputed. Nor is the amount of coal reserve. The dispute is as to how much of or whether that coal can be mined economically in the "near future". Mr. Pritchett says it will be done in ten to twenty years through surface mining, but admits he is not an engineer and that his opinion is somewhat speculative which affects the market value of the reserve. Scott Vaughan is competent to testify as to the feasibility of mining the property. He opines that due to equipment limitations and current state and federal regulations, the property being taken cannot be economically surface mined in the near future and if deep mined, less coal would be recoverable. Mr. Cox opined that the mining prospects were too remote to factor into the highest and best use. Each witness sufficiently explained the procedure followed in fixing before value estimates. We see no merit in Big Rivers' contention that Mr. Pritchett's testimony should have been disallowed. *See Commonwealth, Dept. of Highways v. Tanner*, Ky., 424 S.W.2d 384, 386 (1968). The jury heard all of the evidence, had an opportunity to see the witnesses and form their own conclusions. The jury concluded the "highest and best use" was as a coal reserve that *could be* economically mined in the near future. The record contains evidence of sufficient probative value to support the jury verdict which was within the range of proof. *See Commonwealth, Dept. of Transportation v. Crafton–Duncan, Inc.*, Ky.App., 668 S.W.2d 62, 64 (1984).

■ Big Rivers also contends that the jury verdict was excessive and not supported by sufficient evidence of probative value. It reasons that the taking for the easement covered 7.275 acres of farmland, river bottoms, and woods in a remote location in Ohio County, which amounts to $9,209.00 per easement acre, which at "first blush" is excessive. This argument would make sense if the "highest and best use" was determined to be farmland which was going for around $1,000.00 + per fee acre. The jury however, found the highest and best use was as a coal reserve. The uncontroverted evidence from both engineers, Biggerstaff and Vaughan, showed close to 4,170,000 tons of coal available under the Barneses' property. The amount of recoverable coal varied depending on whether surface mined or deep mined. There was also a difference of opinion as to whether or not parts of the property could be surface mined. There was testimony that Peabody Coal owned an adjacent property which contained the same coal veins as well as other property in the "boot" area. There was testimony that the easement could block access to the coal reserve between the easement and the river, some 17.62 acres, depending on the type of mining recovery used. The jury could have deduced that 25 + acres of coal reserves were affected at $67,000.00 or $2,680.00 per coal reserve acre, which contains around 8,144.53 tons per acre with differences of opinion as to how much coal is recoverable, the mining method to use, and the economic feasibility of mining in the near future. This is where Mr. Pritchett applied his expertise, discounting the future recovery into today's dollars. Mr. Cox gave no opinion based on coal reserves. Mr. Vaughan opined surface mining was out of the question but did offer deep mining as a more viable alternative. However, he did not give a time line or an estimate of the reduction in the amount of recoverable coal if deep mined. The jury accepted Mr. Pritchett's testimony which was within the range of proof offered to the jury and was of sufficient probative value. *See Crafton–Duncan, Inc.*, 668 S.W.2d 62, 64. *See also Commonwealth, Dept. of Highways v. Ginsburg*, Ky., 516 S.W.2d 868 (1974), wherein a jury awarded $200,000.00 for 4.19 acres of *unimproved* land in Bell County. In *Ginsburg*, the Commonwealth had also argued the award was excessive and not supported by substantial evidence. The *Ginsburg* Court accepted the witnesses' opinions that although the land was unimproved, the highest and best use would be for resort-commercial use and the award was not so excessive as to warrant setting it aside. Likewise in the Barneses' case, the jury accepted the highest and best use was as a coal reserve (with proven reserves), and as such the verdict does not appear so excessive as to warrant setting aside the verdict.

■ Big Rivers also contends that repeated references by Barneses' counsel to an offer to purchase their property for $500,000.00 should have merited a mistrial. Big Rivers moved the court to not allow testimony concerning an offer to purchase for $500,000.00. The court correctly ruled the offered price was not admissible. *Commonwealth, Dept. of Highways v. Turner*, Ky., 497 S.W.2d 57 (1973). Nevertheless, Mr. Pritchett testified to such and the court sustained Big Rivers' objection with an admonition to the jury to disregard that statement. During closing arguments, Barneses' attorney again mentioned the half million dollar offer to purchase. The court again sustained the objection. Big Rivers requested a mistrial which was denied, but the trial court did admonish the jury to disregard the statement.

On appeal, Big Rivers contends the intentional injection of inadmissible evidence

into the trial by the expert witness, and by the closing argument of the attorney, was so prejudicial that it could not be cured by an admonition, but required a mistrial. Clearly the testimony of the expert witness and the closing argument comment of the attorney, concerning the half million dollar offer to purchase were improper. *Turner,* 497 S.W.2d 57; *Commonwealth, Dept. of Highways v. Martin,* Ky., 392 S.W.2d 64 (1965). The question then becomes whether an admonition would suffice or should a mistrial have been declared. *Risen v. Pierce,* Ky., 807 S.W.2d 945 (1991), involved a negligence action wherein a new trial was requested after opposing counsel made a reference to excluded evidence in his closing argument. The trial court denied the request for a new trial and the Supreme Court affirmed but made it clear that:

> A party aggrieved by egregious argument should not be required to demonstrate prejudice, ordinarily an impossible task, for to do so would in most cases render reviewing courts powerless to correct the error. Moreover, we take this opportunity to state that such conduct will not be tolerated. Our decision in *Horton v. Herndon,* 254 Ky. 86, 70 S.W.2d 975, 977 (1934), fairly states the law of Kentucky and we reaffirm our reliance thereon:
>
>> "With the view of securing fairness in jury trials, we have adopted a rigid rule to prevent counsel from going outside the record in their arguments to the jury. The rule is that where an attorney makes a prejudicial statement of fact unsupported by the evidence, and the improper argument is brought to the Court's attention, the Court should promptly reprimand him and instruct the jury to disregard the statement and, if it be so prejudicial *that it may improperly influence the jury,* should set aside the verdict obtained by such attorney, and the failure of opposing counsel to ask that the jury be discharged is not a waiver of proper action by the Court." (Emphasis added.)

*Id.* at 949–950. The Court put the duty on the offending party to show the conduct was *not* prejudicial to the opposition. Our question is whether Barneses' attorney has shown the excluded testimony and improper closing remarks did *not* improperly influence the jury so that a mistrial was not required. Barneses' counsel contends the jury verdict of $67,000.00 is an indication in itself that the jury disregarded the evidence (as instructed); otherwise, the verdict would have been considerably higher. The Barneses point out that the jury followed Mr. Pritchett's testimony of the before and after values based on the loss of coal reserves, which proves the excluded evidence and statement had no impact upon the jury's deliberations. We disagree. Mr. Cox and Mr. Vaughan gave very different opinions than that given by Mr. Pritchett. At this point, the jury could have gone either way on the issue of value based on the economic feasibility of mining the coal reserves in the near future. When the jury learned Peabody Coal had offered a half million dollars for the property, that fact bolstered the *probative* value of Mr. Pritchett's testimony that the highest and best use was as a coal reserve which could be economically mined in the near future. *See Tyree,* 365 S.W.2d at 475. Once the jury heard about the offer, it would have been hard to disregard. When counsel stated the offer again in his closing and insisted an expert witness stated it first, we do not believe the jury could have disregarded the statement. We opine that a mistrial should have been declared and we remand the damage award for the taking for a new trial.

The final issue deals with a division of the award between the Barneses, who owned nine-sixteenths of the mineral rights, and the other mineral estate owners who were not joined as parties. Obviously, any award for the coal reserves has to be paid to the owners of the severed mineral estate. The award would depend on the method of removal and the surface owner's rights. Since we are remanding for a new trial, we believe that for judicial economy, the interests of the other owners of the mineral estate need to be addressed together with the proper division between the surface owners and the mineral estate owners. See KRS 353.464 and KRS 353.466 for determining and securing the lost heirs share of any award.

For the foregoing reasons, the judgment of the Ohio Circuit Court is affirmed in part, reversed in part, and remanded.

ALL CONCUR.