Cordella **BASTON**, Appellant,

v.

**COUNTY OF KENTON, Kentucky, ex rel. KENTON COUNTY AIRPORT BOARD, et al., Appellees.**

No. 2008–SC–000319–DG.

Supreme Court of Kentucky.

Aug. 26, 2010.

Robert Wilson Carran, Alice Gailey Keys, Taliaferro, Shirooni, Carran & Keys, PLLC, Philip Taliaferro, III, Taliaferro & Mehling, Covington, KY, Counsel for Appellant.

Joseph L. Baker, Steven Charles Martin, Debra S. Pleatman, Ziegler & Schneider, PSC, Covington, KY, Counsel for Appellees.

Opinion of the Court by Justice ABRAMSON.

In October 2005, the Kenton County Fiscal Court, on behalf of its Airport Board, condemned real property owned by Cordella Baston in Boone County. The condemnation was a small piece in the Airport Board's plan to construct a new north/south runway for the Cincinnati/Northern Kentucky International Airport. Following a jury trial and in accord with the jury's verdict, the Boone Circuit Court awarded Baston compensation damages of $670,000.00. On appeal, a divided panel of the Court of Appeals reversed that award as excessive and remanded for a new trial. In the view of the Court of Appeals' majority, Baston's counsel violated KRS 416.660 and tainted the jury by attempting to show that knowledge of the

runway project had stifled development in the area, thereby requiring the fair market value of Baston's property to be determined by considering sales in areas not subject to the project's debilitating effects. We granted Baston's petition for discretionary review to consider the Court of Appeals' application of KRS 416.660, and we now reverse.

## RELEVANT FACTS

The property in question is an approximately eight-acre tract south of Kentucky Highway 20 along what was Hill Road in the Hebron area of Boone County. Mrs. Baston testified that she and her husband purchased the property, which had been improved with a house, in 1962. They lived there throughout their marriage, using the property not only as their family residence but also to raise a small number of cattle and hogs, some corn, and a large garden. Mr. Baston died in 1991. Mrs. Baston testified that through the years the effects of the airport, which lies to the south, gradually became more pronounced. By the mid–1990s, noise, in particular, frequently rendered patio conversations impossible. In 1995, as part of a noise mitigation project, the Airport Board offered to buy the property, but Mrs. Baston declined. In 1997, the Airport Board notified her of its intent to acquire the property as part of its new runway project. That project was approved in 2001, and Mrs. Baston surrendered the property in 2003, although for trial purposes the date of taking was fixed as of the commencement of trial on October 24, 2005.

As of the taking, the property continued to be zoned as residential, but the central issue at the trial was the continuing appropriateness of residential use given the effects of the airport and the conversion of much of the area's residential property to industrial or commercial. The Airport Board presented testimony to the effect that notwithstanding the Baston property's being subject to substantial airport noise and being virtually surrounded by property long since converted from residential to industrial use, and notwithstanding the Boone County Planning Commission's recommendation that the area surrounding the airport be dedicated to industrial uses, the property was not suitable for industrial development. The Airport Board contended that the property's zoning would not be amended to allow for such development because Hill Road, the county road serving the property, was too narrow for industrial traffic and at its junction with Hossman Road (which provides access to Highway 20) would require tractor-trailers to negotiate an extremely sharp turn. Airport Board experts testified that tractor-trailers could not negotiate the hairpin turn within the existing right-of-way, and another expert testified that the Boone County zoning board was not likely to grant a zoning change unless the road could be widened and extensively improved. Deeming the costs of such improvements prohibitive, the Airport Board's appraiser concluded that the highest and best use of the Baston property would be as a residential subdivision. He therefore sought comparison with other properties that had been purchased by residential developers and concluded that the fair market value of the Baston property was about $45,000.00 per acre, or roughly $350.000.00 total. On cross-examination, he conceded that industrial property in the area commanded a higher price— in his estimate in the $60,000.00 to $90,000.00 per acre range—but he reiterated that in his opinion the Baston property was not suitable for such use.

Baston presented equally qualified experts who opined that Hill Road was not an insurmountable obstacle to industrial development. Her engineering expert tes-

tified that the curve between Hill Road and Hossman Road could be "softened" so as to accommodate tractor-trailers; and her zoning expert testified that Hill Road's thirty-foot right-of-way, although not as wide as the zoning board recommended for industrial purposes, did not violate any regulations and, given the other factors strongly supporting industrial use, would not prevent a zone change. Both experts cited several examples of other properties in Boone County which had been rezoned and developed industrially notwithstanding service roads as narrow as Hill Road and with similarly severe turns. Baston's appraiser, therefore, concluded that warehouse development would be the highest and best use of Baston's property, and, by comparison with similar properties in the area, opined that the fair market value of Baston's property was $100,000.00 per acre, or about $788,000.00 total.

The jury, as noted, returned a verdict valuing the property at $670,000.00, or about $85,000.00 per acre. Clearly, therefore, it accepted Baston's evidence that her property could be developed and used industrially despite the limitations of Hill Road. The Court of Appeals' majority ruled that such a finding was contrary "to the clear weight of the evidence," and that it indicated that the jury had been tainted by Baston's counsel's improper references to the effect of the Airport Board's condemnations on the area surrounding the airport and, in particular, to the fact that the announcement of the runway project had "killed development" on the properties slated to be condemned. The Court of Appeals agreed with the Airport Board that such references violated KRS 416.660 and had the effect of rousing the jury's passion and prejudice against "the airport as a large wealthy entity running roughshod over a poor widowed woman." Convinced that the Court of Appeals both overstepped its role by presuming to re-weigh the evidence in the jury's stead and misconstrued KRS 416.660, we reverse.

## ANALYSIS

Sections 13 and 242 of the Kentucky Constitution and the Fifth Amendment of the United States Constitution permit the taking of private property for public use, but not "without just compensation." Just compensation means a compensation fair to the public in need of the property and paying for it as well as fair to the individual obliged to surrender it. *United States v. 320.0 Acres of Land*, 605 F.2d 762, 780 (5th Cir.1979) (citing *Bauman v. Ross*, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270 (1897)); *Commonwealth, Department of Highways v. Sherrod*, 367 S.W.2d 844 (Ky.1963). Generally, this balance is struck by determining the fair market value of the property at the time of the taking. *United States v. Miller*, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943); *Bianchi v. City of Harlan*, 274 S.W.3d 368 (Ky.2008) (citing *Sherrod* and KRS 416.660). Because the market value is affected by potential uses of the property as well as the use to which it is currently being put, market value means the amount in cash that a willing buyer would pay to a willing seller, taking into consideration "all the uses for which it is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered ... to the full extent that the prospect of demand for such use affects the market value while the property is privately held." *Olson v. United States*, 292 U.S. 246, 255, 54 S.Ct. 704, 78 L.Ed. 1236 (1934) (citations omitted). Generally, any fact a willing buyer or seller would deem material to the negotiation is relevant, but if the landowner wishes to present to the jury a prospective use other than the use to which the property is being

put at the time of the taking, he or she must show both that the land is physically adaptable to such use, and that there is a need or demand for such use at the time of the taking or that there will be in the reasonably near future. *Commonwealth, Department of Highways v. Gearhart,* 383 S.W.2d 922 (Ky.1964). Even relevant evidence may be excluded, of course, if its prejudicial effect substantially outweighs its probative value. KRE 403.

## I. Sufficient Evidence Supported the Jury's Implicit Best–Use Finding

■ The Airport Board's main argument, at trial and on appeal, is that Baston failed to prove that her property was physically adaptable for industrial uses. Using computer-generated diagrams, the Airport Board's architectural and engineering experts purported to show that tractor-trailers could not, within the existing right-of-way, negotiate the hairpin turn between Hill Road and Hossman Road. Because, according to the Airport Board, enlarging the road and fixing the curve would be exorbitantly expensive, the Baston property could not be deemed adaptable to industrial use. Baston's engineering expert disagreed. He testified that he was familiar with the sort of software the Airport Board's engineer had employed and that it tended to depict what would be the most desirable conditions in an ideal world, but that it did not exhaust what could be done in the real world. He testified that he had inspected Hill Road and its curve and that based on his forty years of experience helping to develop industrial sites and his personal knowledge of several Boone County industrial sites served by similarly narrow roads with sharp turns (which he named and described), he believed the Hill Road curve could be ameliorated to permit tractor-trailer use. This testimony was consistent with that of Mrs. Baston, who testified that school buses and all manner

of trucks, including tractor-trailers, had navigated the Hill Road curve. Characterizing the engineer's testimony as "bald" and "wholly unsupported," the Court of Appeals' majority agreed with the Airport Board that Baston had failed to show that the property was capable of industrial use. We disagree.

■ Mrs. Baston's engineer was duly qualified by training and long experience to form an opinion about the amenability of Hill Road and its sharp turn to tractor-trailer traffic. His testimony was supported by the several real-world, Boone County examples he cited where similarly narrow roads with sharp turns had not foreclosed industrial development. His testimony was also supported by that of Mrs. Baston, who indicated, contrary to the computer model representations of the Airport Board's experts, that she was aware from living in the area for over forty years that it was possible for trucks to negotiate the Hill Road turn. Under KRE 702, the admissibility of expert testimony is a matter entrusted to the discretion of the trial court. *The Goodyear Tire and Rubber Company v. Thompson,* 11 S.W.3d 575 (Ky.2000). The trial court did not abuse that discretion by admitting the testimony of Baston's well-qualified engineer.

■ Once it is properly admitted, "[e]valuation of the weight which should be given to expert testimony is the exclusive province of the jury." *Ellison v. R & B Contracting, Inc.,* 32 S.W.3d 66, 76 (Ky. 2000). A reviewing court may overturn a jury's verdict "only when it is so flagrantly against the weight of the evidence as to indicate passion or prejudice." *Denzik v. Denzik,* 197 S.W.3d 108, 110 (Ky.2006) (citing *Bierman v. Klapheke,* 967 S.W.2d 16 (Ky.1998)). The jury here was not obliged to accept the Airport Board's expert evidence uncritically, nor was it obliged to

discount Baston's evidence merely because her engineer did not engage in a battle of computer-generated diagrams. On cross-examination, he was asked if he understood the turning radius requirements of tractor-trailers. He testified that he did and still maintained that the Hill Road turn could accommodate tractor-trailer traffic. The Airport Board was free to cross-examine further the basis of the engineer's opinion, but it chose not to do so. The jury could reasonably rely on the engineer's testimony to conclude that Hill Road did not pose the insurmountable obstacle to industrial use that the Airport Board claimed. The Court of Appeals usurped the jury's role by ruling otherwise.

## II. The Trial Was Not Tainted By Improper Argument

The Court of Appeals also concluded that the jury was likely to have weighed the evidence as it did because it had been tainted by Baston's counsel's references to and questions concerning the effect of the runway project on development in the condemned area and more generally by references to the airport's assets and resources. The Court of Appeals believed the references to the effect of the project violated KRS 416.660 and, furthermore, the references to the airport's assets impermissibly invited the jury to view the case as pitting a large, callous public entity against a lone, elderly woman. We consider the alleged statutory violation first.

### A. KRS 416.660 Requires That the Market Effect of the Government Project be Corrected in Arriving at Fair Market Value

▆▆▆ As noted above, the general rule is that the condemnor must pay the fair market value of the property at the time of the taking. An impending condemnation, however, can distort the market by inflating or depressing land values. *United States v. Reynolds*, 397 U.S. 14, 16, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970). ("[T]he 'market value' of property condemned can be affected, adversely or favorably, by the imminence of the very public project that makes the condemnation necessary."). As the United States Supreme Court has observed, "it would be manifestly unjust to permit a public authority to depreciate property values by a threat of the construction of a government project and then to take advantage of this depression in the price which it must pay for the property when eventually condemned." *United States v. Va. Elec. Power Co.*, 365 U.S. 624, 636, 81 S.Ct. 784, 5 L.Ed.2d 838 (1961) (citation and internal quotation marks omitted). The depreciatory effects of a projected condemnation are often referred to as "condemnation blight." *See, e.g., Howell Plaza, Inc. v. State Highway Comm.*, 92 Wis.2d 74, 284 N.W.2d 887, 890–91 (1979); (*citing*, 4 Nichols, *Eminent Domain* § 12.3151(b)(5) (3d ed.)). ("The term 'condemnation blight' has been coined to denote 'the debilitating effect upon value of a threatened, imminent or potential condemnation.'"). It would be similarly unjust to require the government to pay a price inflated by the prospect of condemnation, *Reynolds, supra*, and so the rule has evolved that market value should be determined as if the condemnation did not exist. *United States v. 8,968.06 Acres of Land*, 326 F.Supp. 546 (S.D.Tex.1971) (*citing United States v. Miller, supra*).

Kentucky has codified this rule in KRS 416.660, which provides in pertinent part that "[a]ny change in the fair market value prior to the date of condemnation which the condemnor or condemnee establishes was substantially due to the general knowledge of the imminence of condemnation or the construction of the project shall be disregarded in determining fair market

value." To reiterate, the statute does *not* state that the impact of the proposed condemnation or project shall be excluded from evidence but rather that fair market value should be determined by disregarding any such impact. Thus, if knowledge of the construction of a highway project has caused property in the vicinity to triple in value, the condemnor must be allowed to develop that evidence so as to substantiate a lower fair market value than what would be derived from examining recent, inflated sales in the area. Conversely, if knowledge of a project has depressed property values or limited options for development that otherwise would have existed, the landowner must be allowed to establish how and to what extent property values have been adversely affected.

Precisely how this correction for the influence of the project is to be made is a matter that must be determined on a case-by-case basis depending, among other things, on the particular project involved and whether its effect is depreciatory or inflationary. Although generally the property is to be valued at the time of taking, to eliminate the distorting effect of the project courts have sometimes admitted evidence of value at the time the project was first announced. *In re the City of New York*, 25 Misc.3d 288, 887 N.Y.S.2d 776 (Sup.Ct.2009). In other circumstances, courts have excluded evidence of allegedly comparable sales where the sales likely reflect project-influenced prices. *State v. Kapahi*, 48 Haw. 101, 395 P.2d 932 (1964); *United States v. 10.082 Acres of Land*, 2007 WL 962846 (D.Ariz.2007). There may be other ways to "remove" the market's knowledge of the project, and trial courts are free to employ them as appropriate.

 KRS 416.660 does not, therefore, as the Airport Board maintains and as the Court of Appeals held, bar all evidence of the project's effect. Where condemnation blight or project influence is alleged, the better practice is to address the evidentiary ramifications prior to trial in a KRE 104 hearing. In this case, the Airport Board raised the issue prior to trial, but took the position that the statute rendered the project's influence irrelevant and evidence about it therefore inadmissible. As just discussed, however, where shown to exist, the project's influence on the market value of affected property is highly relevant and evidence correcting for that influence must be allowed. The record contains no written ruling on the Airport Board's motion and it appears that the trial court opted to deal with the matter as the evidence was offered at trial.

 Because the issue was not actually addressed prior to trial, evidence of project influence came up somewhat haphazardly during trial, but not so as to constitute reversible error. Baston introduced evidence that in 1997 the Airport Board notified her and other landowners in the path of the new runway that it intended to condemn their land. Not long thereafter the runway project became public knowledge. Baston also introduced some evidence and sought to introduce other evidence that following these notices no development took place on the properties earmarked for condemnation, because the condemnation "had killed development in the area." The relevance of this evidence was two-fold: it provided a reason other than the property's alleged unsuitability for the fact that Baston's property had not been industrially developed, and it helped explain why her appraiser had not been able to refer to comparable sales in the immediate vicinity of her property but had had to look for comparable sales at other points along the airport's perimeter. It may well be that a proper pre-trial motion could have rendered these points

uncontested and some of the evidence therefore unnecessary, but without that preliminary determination the trial court did not abuse its discretion by denying the Airport Board's repeated motions for a mistrial on the ground that references to the project's influence violated KRS 416.660. The Court of Appeals erred by ruling otherwise.

In the same vein, the Airport Board asserts that Baston violated KRS 416.660 when she elicited testimony from the airport's Deputy Director of Aviation that the Airport Board had prevented, by way of condemnation, the development of an Au Chocolat franchise on property near Baston's when it learned that the proposed development would interfere with roadways the airport wished to preserve. Counsel then asked the Airport's Deputy Director if Au Chocolat had not purchased property at another point along the perimeter for $82,500.00 per acre. There was no objection to this question, and the witness answered that Au Chocolat had relocated, but that he did not know any of the details of the transaction. When counsel later asked whether development of the Au Chocolat franchise on the parcel near Baston would not have made neighboring property more valuable, the Airport Board objected and its objection was sustained. ▮ Notwithstanding its successful objection, the Airport Board insists that reference to a phantom comparable sale violated KRS 416.660 and necessitated a mistrial. Although it is not clear from the testimony that the Au Chocolat condemnation was part of the runway project, even if it was, evidence that the project prevented potentially comparable sales near Baston's property was relevant, as noted above, to explain why Baston had to look at property farther away for such sales. Whether or not Baston's counsel should have referred to the price of a sale that had not been introduced into evidence and shown to be comparable, the Airport Board did not timely object to that reference, and the reference does not amount to a palpable error.[1] The $82,500.00 per acre figure was well within the range the Airport Board's own expert assigned to the value of industrial property in the area, and in light of the plethora of evidence concerning industrial development surrounding the airport, reference to this particular development cannot be said to have swayed the jury's best-use determination or otherwise to have resulted in a manifest injustice. CR 61.02.

In sum, KRS 416.660 does not, as the Airport Board argues and as the Court of Appeals held, require that increases or decreases in market value caused by the announcement of a government project be disregarded in the sense of being completely ignored. It requires, rather, that the announcement's effect on the market be disregarded in the sense of being corrected for, of being removed, in determining the fair market value of the property. The correction may involve excluding evidence of tainted values or, as in this case, permitting evidence tending to show what the use and value of the condemned property would have been absent market awareness of the project. Although it could, perhaps, have been limited by an appropriate pretrial motion, the evidence admitted and referred to at trial tending to show that the announcement of the runway project prevented industrial development in the area earmarked for condemnation did not violate the statute and does not entitle the Airport Board to relief.

---

1. Baston called the airport Deputy Director as a witness but, pursuant to KRE 607, she was entitled to impeach his credibility and, pursuant to KRE 611(c), to ask leading questions.

## B. Incidental References to the Airport's Wealth and Assertions of Mrs. Baston's Right to Justice Did Not Amount to Improper Argument

Finally, the Airport Board insists that Baston's counsel improperly sought to portray the Airport Board as dealing with Baston in bad faith and improperly appealed to the jury's prejudice against large institutions. Relying on cases such as *Risen v. Pierce*, 807 S.W.2d 945 (Ky.1991), in which we have refused to tolerate counsel's references in questioning and in closing argument to matters expressly excluded from evidence, the Airport Board focuses much of its argument on counsel's assertedly improper references to the market effects of the project. As just discussed, however, those references did not violate KRS 416.660; nor were they outside the record as expressly ruled upon by the court. They do not, therefore, come within the rule addressed in *Risen*.

Counsel's remarks were improper aside from the statute, the Airport Board asserts, because they insinuated that the airport announced the project as early as it did, in 1997, so as to depress the value of the property it planned eventually to condemn. This argument is unavailing, however, because Baston's counsel did not argue that the value of the condemned properties had been depressed. He noted, rather, that their industrial development had been stifled, a result clearly stemming not from any bad faith on the airport's part but from the plain economic fact that rarely will property slated for condemnation be developed.

Relying on cases such as *Clement Brothers Company, Inc. v. Everett*, 414 S.W.2d 576 (Ky.1967) and *Rockwell International Corporation v. Wilhite*, 143 S.W.3d 604 (Ky.App.2003), in which relief was granted from what were deemed excessive damage and punitive damage awards on the ground that counsel had engaged in flagrantly improper closing argument, the Airport Board also complains that Baston's counsel improperly appealed to the jury's passions and prejudice in a number of ways. Counsel is said to have erred by asking in his opening statement whether the Airport Board had acted in good faith when it offered to buy Baston's property in 1995 as a part of its noise mitigation program and by stating in closing argument that the current offer for Baston's property—$350,000.00—was not enough, was not "the kind of compensation that she deserves for hanging in there. That's not her measure of justice on this day." The Airport Board also insists counsel erred during his questioning of the airport's Deputy Director, by asking about the Airport Board's acquisition of millions of dollars worth of property, its ownership of over 7,000 acres of real estate, its pollution violations, and the large number of appraisers under contract to it. Although all of these questions were objected to and all of the objections were sustained, the Airport Board maintains that the unanswered questions themselves, together with the assertedly improper opening and closing remarks were intended to, and did, paint the airport as a rich and heartless entity running roughshod over a defenseless individual. We disagree.

The Airport Board is correct that flagrantly improper argument can justify overturning a verdict that otherwise appears excessive. *Smith v. McMillan*, 841 S.W.2d 172 (Ky.1992); *Clement Brothers, supra*; *Rockwell, supra*. However, the argument here was not improper, much less comparable to the flagrantly improper references to excluded evidence and express characterizations of foreign corporations as wolves preying upon humble Kentuckians that our earlier cases have deemed intoler-

able.[2]

Here, Baston was permitted to question the Deputy Director about the airport's concerns regarding development in the likely path of airport expansion. The Deputy Director explained that the airport generally preferred industrial development around its perimeter because residential development was more expensive to mitigate. Accordingly, he testified, the Airport Board had on a number of occasions intervened, either in the market or by condemnation, to prevent a planned residential development. This testimony could be thought to lend credence to Baston's proof that her property was better suited for industrial purposes than residential, and also to undermine the Airport Board's contrary contention as contrived.

To bolster her claim that residential development was not appropriate around the airport, Baston attempted to show that the airport was a source of other forms of pollution besides noise pollution, but those questions were disallowed for want of expert testimony. Baston also wished to argue that because the airport itself owned so much of the surrounding land, the price of the remaining land had been bid up, but that evidence, too, was disallowed, in part no doubt to prevent any undue emphasis on the parties' disparate financial circumstances. These questions and the arguments they were meant to support, although not admitted, are simply not comparable to the arguments deemed intolerable in the cases cited above.

The Airport Board, first of all, is not a foreign corporation against whom hometown bias could be incited. Counsel did not characterize the airport as grasping or wolfish, did not refer to the mansions of airport executives and did not refer to airport counsel as cold-blooded and mercenary. While Baston's counsel's remarks were pointed they were not gratuitous or inflammatory. Counsel did not, in short, invite the jury to substitute a purely emotional response to the parties, in lieu of a reasoned consideration of the evidence under the court's instructions.

 Counsel's questioning of the Airport Board's "good faith" in his opening statement, although the most questionable of the remarks about which the Airport Board complains, was reasonably calculated to convey not that the airport had engaged in any wrong doing but rather that in pursuing its own interest it had offered Baston less for her property than a disinterested person might have done. It is not improper for counsel to ask the jury to assess the other side's case critically.

---

**2.** In *Smith,* counsel for a defendant-physician in a medical malpractice case equated being sued for malpractice with criminal charges, referred repeatedly to "presumably horrible" photographs that had been excluded from evidence, accused the plaintiff's expert of collaborating with plaintiffs counsel simply to earn money and suggested that all of plaintiffs counsel's objections had prevented the jury from seeing the case he could have properly presented on behalf of the unfairly maligned physician. 841 S.W.2d at 174. In *Clement Brothers,* plaintiffs counsel characterized the corporate defendant in a negligence case involving blasting damages as a "rich, grasping, foreign corporation running ruthlessly roughshod over the poor, honest, long-suffering citizens of Barren County; its attorney as a rich man who would be upset if it were his 'mansion' that suffered the blasting damage" and the whole scenario as akin to "a wolf devouring a lamb." 414 S.W.2d at 577. In *Rockwell,* plaintiff's counsel referred repeatedly to the corporation's California base "where everybody has got a tan and a $60 haircut and life is good." Counsel also implored the jury to consider the difference between men (which God made with a soul) and corporations (which men made to make money), and the champagne corks that would pop in Seal Beach, California if the jury did not impose punitive damages. 143 S.W.3d at 627–28.

Given the tension, moreover, between on the one hand the Deputy Director's testimony that the airport generally opposed the residential development of surrounding property, and, on the other hand, the Airport Board's claim that Baston's property was best suited for residential development, counsel could legitimately ask the jury to question the sincerity of the Airport Board's offer.

 ■ Finally, it was not improper for counsel to refer in closing to Baston's "measure of justice." Baston was, after all, entitled to "just compensation." We fail to see how counsel's assertion of that right in any way maligned the Airport Board or appealed unfairly to the jury's emotion. In the end, the jury was well aware that it was addressing the fair market value of a local citizen's long-time residential property, property that one of the nation's largest international airports, an important corporate citizen and local employer, found necessary for expansion of its operations.

### CONCLUSION

 In sum, under both the Kentucky and the United States Constitutions, a landowner whose property is taken for public purposes must be justly compensated. In Kentucky, a jury ultimately determines what compensation is just, and in this case there was more than ample evidence for the jury to decide that the Baston property, surrounded by industrial development and in an area which both the Airport Board and the Boone County Planning Commission envisioned as industrial, would be put to its highest and best use by being developed industrially rather than residentially. Notwithstanding the fact that the property was served by a narrow road that was not ideal and needed improvement, other properties in the area had been adapted for industrial use and qualified experts opined that the Baston property could also become industrial in use with appropriate, feasible modifications to the road. The Court of Appeals erred by substituting its weighing of the evidence for that of the jury. The Court of Appeals erred further by ruling that the landowner's counsel appealed impermissibly to the jury either by referring to the effects of the airport's runway project or to the obvious fact that the Airport Board is a large landowner with formidable resources. KRS 416.660 requires that the market effects of government projects be removed from the determination of a condemned property's market value, not that they be ignored and suppressed altogether from evidence. Finally, the airport's wealth was hardly a secret, and counsel's references to it were not gratuitous, inflammatory statements likely to distract the jury from the relevant evidence. Accordingly, we reverse the Opinion of the Court of Appeals and hereby reinstate the November 29, 2005 Judgment of the Boone Circuit Court.

MINTON, C.J.; CUNNINGHAM, NOBLE, SCOTT, and VENTERS, JJ. concur. SCHRODER, J., not sitting.