RENDERED: JUNE 15, 2017
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2015-SC-000711-DG

DATE 7/6/17 Kim Redman, DC

PADUCAH INDEPENDENT SCHOOL
DISTRICT

APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.    CASE NO. 2014-CA-001782-MR
MCCRACKEN CIRCUIT COURT NO. 11-CI-00316

PUTNAM & SONS, LLC

APPELLEE

## OPINION OF THE COURT BY JUSTICE HUGHES

## REVERSING

In March 2011, as part of a plan to replace its aging middle school, the Paducah Independent School District initiated condemnation proceedings against real property owned by Putnam & Sons, LLC, an Oregon Limited Liability Company (Putnam).[1] Following the Commissioners' report and award of $96,000 to Putnam, the property was officially "taken" as of May 19, 2011. Exceptions to the Commissioners' report by both sides ensued, as did numerous continuances to accommodate attorneys and witnesses, as well as a continuance to allow for reassignment of the case to another judge of the

---

[1] *See* Kentucky Revised Statute (KRS) 162.030 for the District's authority, in accord with the Eminent Domain Act of Kentucky, KRS 416.540-.670, to condemn property necessary for school purposes.

McCracken Circuit Court. Ultimately, a bench trial was held in July 2014, the upshot being an award of compensation damages to Putnam of $115,000. Putnam appealed the award to the Court of Appeals, and a unanimous panel of that Court reversed. In the panel's view, the trial court relied on outdated and otherwise incompetent evidence of the property's fair market value, thus necessitating a retrial of the compensation issue. We granted the District's motion for discretionary review to consider its claim that the trial court's findings were in fact adequately supported by the record and appropriately addressed the parties' starkly competing appraisals of Putnam's loss. Agreeing with the District that the trial court's approach was both legally sound and properly grounded in the record, we reverse the decision of the Court of Appeals and reinstate the trial court's judgment.

## RELEVANT FACTS

The property at issue is a 2.79 acre tract on the west side of South 31st Street in Paducah at the southwest corner of the intersection of Adams Street and 31st. The record reflects that Putnam's predecessor, Putnam & Son, an Oregon-based cabinetry-manufacturing partnership, purchased this tract and two others in March 1982 from the Modine Manufacturing Company. Modine, at one time a renowned maker of tractor radiators, had, since the 1940s, operated a radiator factory on the opposite, or east, side of 31st Street. The factory premises occupied an approximately 8.2 acre tract that extended south from Clark Street to the four-lane Jackson Street (U.S. Highway 62), and east from 31st Street some 500 feet to a spur of what was then the Paducah and

2

Illinois Railroad Company (more recently the Illinois Central Gulf Railroad, Inc.). The main improvement on the factory premises was a single-story manufacturing facility of nearly 132,000 square feet. This facility was divided into a relatively small office space at the south end, which fronts along Jackson Street, and storage and manufacturing space extending throughout the remainder of the building to the north. At some point four smaller out buildings, with an additional 20,000 or so square feet of storage, were added to the north end of the property.

The Modine facility was served by two parking lots. An approximately 0.19 acre lot at the northwest corner of Jackson and 31st Street served the facility's office portion, while the tract at issue in this proceeding, the 2.79 acre parcel across 31st Street from the factory and just south of Adams Street (sometimes referred to herein as the Subject Tract), served the factory's more than two hundred production employees. At the time of the taking, the smaller lot on Jackson Street had an asphalt surface; the Subject Tract had a gravel surface and a chain-link fence around its perimeter. Although the two parking lots are near each other on the west side of 31st Street, they are not contiguous; they are separated rather by property improved with at least one building that belongs to someone else.

As noted and according to Putnam's appraiser, in 1982 Putnam's predecessor, the Putnam & Son partnership, purchased from Modine all three tracts—the large, improved tract on the east side of 31st Street and the two parking lots on the west side. Attracted especially by the ready rail access, the

company bought the large parcel, in particular, to serve as a south-central storage-and-distribution center for its mainly Oregon-based cabinetry business. Through the years, apparently, Putnam & Son used the old Modine facility for some light manufacturing, as storage space to support the distribution its own products (through Sears and J.C. Penney stores, for example) and as warehouse space it leased to others. The partnership never used the facility for full-scale manufacturing and appears never to have required more than a handful of employees at a time. Over time, the percentages of the facility devoted to the different uses gradually tipped more and more exclusively toward warehousing.

By about 2002, it appears, the Putnam & Son partnership was succeeded by the Defendant, Putnam & Sons, LLC. Tom Putnam, the "Son" of the original partnership, testified that in April 2002, not long after his father (the partnership's "Putnam") passed away, he transferred the partnership's property to the new LLC. He testified that the real property had been appraised at the time as worth $1.1 million and that he understood the transfer as pertaining only to his father's one-half interest. No such appraisal was introduced into evidence, however, and as noted by the District, the deed effecting the transfer is not so qualified. Its required certificate of consideration,[2] on the contrary, provides that the fair market value of the

---

[2] *See* KRS 382.135.

4

entire transferred property is $580,000, of which, Tom Putnam testified, $30,000 was personalty.

In its new incarnation, the LLC seems essentially to have ceased to maintain the nearly sixty-year-old Modine building, the usefulness of which even for warehousing gradually diminished as the roof deteriorated and leaked. The record indicates that between January 2007 and August 2010, just prior to the commencement of this action, Putnam had its Modine property listed for sale, initially for $1.5 million in 2007, then gradually reduced to $975,000 in the summer of 2010. During roughly the same period, the LLC's income from storage leases decreased from about $70,000 to about $31,000.

Meanwhile, Paducah's School District was having aging-building problems of its own. According to Randy Green, the Superintendent of Paducah Public Schools at the time of the 2011 middle school project, portions of Paducah's Middle School were more than eighty years old. The building as a whole had been designated a "category five" by state officials—the worst building designation in the state system. According to Superintendent Green, the building had become unsafe, and its replacement was imperative. State school-building codes had changed during the years, moreover, so that even though the plan was to remove the old building and to build its replacement on the same site—Paducah Middle School sits on the southeast side of Lone Oak Road (U.S. Highway 45), a couple of blocks west of 31st Street and the Subject Tract—the then-current code required the new building to be supported by at

least eleven acres, a considerably larger space than the old school occupied.[3] To meet that new, larger campus requirement, the District looked to acquire property for the most part east of the school extending all the way to Putnam's 2.79 acre tract on South 31st. The Superintendent testified that the District negotiated the purchase of thirty-three relatively small intervening parcels, most of which had been improved with modest, single-family residences, but the parties could not agree as to the value of the Subject Tract. The disagreement between Putnam and the District finally prompted the March 2011 initiation of condemnation proceedings.

To a large extent, the parties' disagreement concerns whether the 2.79 acre Subject Tract can be valued independently of Putnam's neighboring properties, in particular the 8.2 acre tract across 31st Street, or whether it should be valued as still an integral part of a larger whole. The District, not surprisingly, argued for an independent valuation. Its appraiser, duly licensed and certified and possessing more than forty years' experience in the Paducah and McCracken County market, acknowledged that more than thirty years earlier the Modine Company had made an integrated use of the factory tract and its employee parking lot. He noted, however, that Putnam's own use of the

---

[3] Although we have tried to simplify the description of how the various properties are situated, we should note that Paducah's street system is not strictly grid-like, nor, in this old river town, do the streets align very exactly with the compass points, aligning rather with a more-or-less northwest by southeast stretch of the Ohio River. Lone Oak Road, for example, runs obliquely to 31st Street, which itself runs not so much north-south as parallel with the river northwest to southeast, thus making it possible for the Superintendent to testify that the District had acquired property east of the school and south, not west, as we have put it, of 31st Street.

6

factory tract had never depended on the 2.79 acre Subject Tract across the street, and he opined, based on his long experience in Paducah, that no such integrated use was then reasonably foreseeable for the area. Instead, he offered evidence of exchanges involving four other Paducah area vacant lots, which evidence, he asserted indicated a stand-alone market value for the Subject Tract of about $55,000 (about $0.45/sq. ft. of land area—almost exactly the tax-assessment value of $54,000), to which he would have added $5,000 for the chain-link-fence improvement for a total value of $60,000.

Putnam, on the other hand, insisted that its compensation should be based on the value of its property as a whole before and after the taking. According to its appraiser, also licensed and well certified, although from outside McCracken County and so with less direct experience of that particular market, the factory tract, given its fairly direct access to Interstate 24 and to a couple of Paducah's U.S. Highways, could, in conjunction with the graveled 2.79 acre tract, be made into a regional or even national warehousing facility once the building's roof was repaired. The 2.79 acre Subject Tract was essential to that use, according to the appraiser, because such warehousing facilities require a relatively high ratio of open space to building space in order to accommodate the temporary storage of large, long-distance semi-trailers. Without the Subject Tract, the Putnam appraiser testified, warehousing was still the best use for the factory tract—assuming its building was repaired—but the lessened ability to accommodate large trailers would limit the facility to a more local shipping and storage market. Citing sales from cities well outside

7

Paducah, such as Henderson and Madisonville and even Bowling Green, Bardstown, and Elizabethtown, the appraiser claimed that national/regional warehousing facilities were worth in the neighborhood of $10/sq. ft. of building area, whereas local storage facilities were worth only about $5/sq. ft. Having made what he claimed were appropriate adjustments for roof repair, Putnam's appraiser testified that the before-taking value of Putnam's entire property as a potential integrated regional warehousing facility was about $1.1 million, whereas the after-taking value of the factory tract (plus the smaller parking lot) as a potential primarily local storage facility would be only about $350,000. Subtracting the latter amount from the former, the appraiser maintained that Putnam's compensation for the taking of the Subject Tract should be about $750,000.

It so happened that a little more than a year after the taking, while the case was still pending, Putnam in fact sold the factory tract and the smaller parking lot for $435,000. In light of that sale, Putnam conceded at trial that the factory-tract-plus-smaller-parking-lot remainder had been worth that amount—$435,000—immediately after the taking, thus reducing, the compensation to which it was entitled under its integrated-property theory from $750,000 to $665,000.

Even assuming that Putnam's properties were not integrated so that a stand-alone appraisal of the Subject Tract was appropriate, Putnam's appraiser took serious issue with the District's appraisal. According to Putnam's appraiser, among the major driving forces in Paducah's economy were its two

8

regional hospitals, Western Baptist Hospital, to the northeast of Putnam's property toward downtown, and Lourdes Hospital, to the southwest and closer to Interstate 24. Even the District had observed that these two hospitals made Paducah the largest medical center between St. Louis, Missouri and Memphis/Nashville, Tennessee. Putnam's appraiser opined that the Subject Tract's location only a block off the commercially well-developed Jackson Street (U.S. Highway 62) and its strategic position directly between the two hospitals made it a choice location for medical office or retail development. It was thus, according to Putnam's appraiser, quite unlike the differently situated vacant lots to which the District's appraiser had compared it, and quite like some of the city's most valuable vacant properties in other areas. Such properties, according to Putnam's appraiser, could be worth in excess of $300,000/acre, but in his view the Putnam lot was most comparable with lots sold at prices suggesting a value of $217,800/acre, or about $5/sq. ft. of land area. At that rate, even standing alone, the Subject Tract (121,682 sq. ft.) was worth $608,410, or more than ten times the District's appraisal.

As has been observed many times, "[d]etermining the value of real estate is not a science," *Portland Nat. Gas Transmission Sys. v. 19.2 Acres of Land,* 318 F.3d 279, 281 (1st Cir. 2003). Confronted with appraisals as disparate as those in this case, a fact-finder could be forgiven for thinking that it is not even much of an art, or if an art, a creative one rather than a practical. The trial court here, in its Findings of Fact, Conclusions of Law and Judgment explained why neither party's appraisal approach struck it as persuasive.

9

The court rejected, to begin with, Putnam's bid to have its properties evaluated as an integrated whole, noting that there was no evidence that the 8.2 acre factory tract had depended on the Subject Tract since Modine ceased operations in the 1980s. Further, the court noted that zoning ordinances introduced by the District indicated that the smaller parking lot left to Putnam would adequately support even a full-scale warehousing operation (as understood by the zoning authorities) at a refurbished Modine facility. The court also rejected Putnam's $608,000 stand-alone evaluation of the Subject Tract, on the ground simply that Putnam's sale in 2012 of its remaining holdings of more than eight acres for $435,000, made it unreasonable to believe that a year earlier a *quarter* of that acreage (2.79 acres to be exact) had been worth $175,000 *more.* In the trial court's view, the District's appraisal was equally unhelpful because the appraiser's ostensibly comparable sales "were not arms-length transactions (or even sales at all) or they involved properties where the highest and best use was not the same high level of commercial use that is enjoyed by the Subject Property."

Thus left in the lurch by the parties, the court relied on the only evidence before it of transactions actually involving Putnam's properties. It noted, first, the deed that Tom Putnam executed in April 2002, whereby the Putnam & Son partnership transferred the partnership's entire holdings to the new Putnam & Sons, LLC. Aside from the small amount of personalty that Tom Putnam testified was included in the transfer, the deed indicates, as the court observed, that in 2002, "Putnam valued all of the Modine properties at $550,000." The

10

court also noted the 2012 sale of the 8.4 acre remainder—factory tract plus small parking lot—for $435,000. Assuming that those values—$550,000 for the whole in 2002 and $435,000 for the remainder in 2012, could serve as reasonable approximations for their May 2011 counterparts, the trial court arrived (by subtraction) at a May 2011 value for the taken 2.79 acre Subject Tract of $115,000. That that amount for a tract roughly a fourth of the size of the remainder turned out to be roughly a fourth of the amount Putnam had received upon sale of the remainder, provided at least some confirmation, the court believed, for its assumptions regarding 2011 values. It also provided reasonable assurance of fair and just compensation for Putnam's loss.

As noted, Putnam appealed from that ruling, and the Court of Appeals reversed. The appeals panel expressed concern that in rejecting Putnam's integration theory the trial court gave too much weight to how Putnam had actually used the property—in a very limited warehousing capacity—and had not paid sufficient heed to Putnam's appraiser's testimony. He had testified to the potential use of the property for full-scale warehousing on a regional basis, a use that would require (according to the appraiser) both the factory tract and the Subject Tract and would thus affect the market value of both.

The appeals panel also rejected the trial court's assumption that Putnam's 2002 valuation of its Modine properties could be considered a reasonable approximation of their value as a whole in May 2011. The 2002 deed was unreliable, the panel believed, both because of its age ("It is difficult to fathom that the entire property was worth the same amount in 2011 as it

11

was in 2002.") and because it "represented a transfer between interrelated companies." This latter fact called into doubt, in the panel's view, whether the 2002 deed could even be thought reliable evidence of fair market value in 2002, much less in 2011. ("There was no testimony that this transfer represented the actual fair market [value] of the property in 2002.") The trial court's reliance on this "incompetent" evidence, the panel concluded, was by itself enough to require reversal of the judgment.

Contesting that conclusion, the District maintains that the Court of Appeals converted a question about evidentiary weight—the probative value of the 2002 transfer—into a question about evidentiary "competency." As the District sees it, by a sort of sleight of hand, the appellate court substituted its view of the evidence for that of the fact finder. With respect to Putnam's integration theory, the District insists that the trial court properly discounted that theory as speculative. The District contends it is the appeals panel that errs, dangerously and fundamentally, by opening the door in condemnation proceedings to valuations based on mere theoretical uses of the taken property, rather than on uses shown to have a real likelihood of being made.

This case provides yet another example of the dueling-appraisal dilemma regularly confronted by trial courts in condemnation proceedings. We granted the District's motion for discretionary review to consider the trial court's discretion in the face of that dilemma. Having carefully reviewed the record, we agree with the District that the trial court did not err or abuse its discretion in this case. We begin our analysis with the trial court's rejection of Putnam's

12

integration theory, and then consider the use the trial court made of Putnam's 2002 valuation of its property.

## ANALYSIS[4]

### I. The Trial Court Appropriately Rejected Putnam's Integrated-Use/Warehousing Theory of Valuation.

As Putnam rightly insists, the taking of its property by a public entity has constitutional implications. The constitutions of both Kentucky and the United States allow such takings, but only for valid public purposes, and then only where the private interest is "justly compensated." *Baston v. Cty. of Kenton ex rel. Kenton Cty. Airport Bd.,* 319 S.W.3d 401, 406 (Ky. 2010) ("Sections 13 and 242 of the Kentucky Constitution and the Fifth Amendment of the United States Constitution permit the taking of private property for public use, but not 'without just compensation.'"). Putnam concedes that the District's need and desire to replace its eighty-year-old middle school is a valid public purpose. The main issue before the trial court, therefore, was compensation.

In *Baston,* we addressed the idea of "just compensation" as follows:

---

[4] As noted above, the parties opted in this case to have the compensation question decided without a jury at a bench trial. Appellate review of such trials is governed by Kentucky Rule of Civil Procedure (CR) 52.01, which requires the court to render its judgment by way of specific factual findings and express legal conclusions based thereon. The trial court's findings are subject to review only for clear error. That is, they are to be upheld if supported by substantial evidence, and of course due regard must be given to the court's prerogative to judge the credibility of witnesses and to assess the weight of evidence. "[S]imple doubt as to the appropriateness of a finding will not justify its reversal." *Ky. Props. Holding LLC v. Sproul,* 507 S.W.3d 563, 569 (Ky. 2016) (citation omitted). Appellate review of the trial court's legal determinations and conclusions is *de novo. Id.*

13

> Just compensation means a compensation fair to the public in need of the property and paying for it as well as fair to the individual obliged to surrender it. *United States v. 320.0 Acres of Land,* 605 F.2d 762, 780 (5th Cir. 1979) (citing *Bauman v. Ross,* 167 U.S. 548, 17 S. Ct. 966, 42 L. Ed. 270 (1897); *Commonwealth, Dep't of Highways v. Sherrod,* 367 S.W.2d 844 (Ky. 1963). Generally, this balance is struck by determining the fair market value of the property at the time of the taking. *United States v. Miller,* 317 U.S. 369, 63 S. Ct. 276, 87 L. Ed. 336 (1943); *Bianchi v. City of Harlan,* 274 S.W.3d 368 (Ky. 2008) (citing *Sherrod* and KRS 416.660).

319 S.W.3d at 406.

Since for condemnation purposes "fair market value" is understood as "the amount in cash that a willing buyer would pay to a willing seller," *id.,* Putnam correctly notes that the fair-market-value determination is not limited to the use currently being made of the property. The estimate of fair market value, rather, should take into consideration

> all the uses for which it [the taken property] is suitable. The highest and most profitable use for which the property is adaptable and needed or likely to be needed in the reasonably near future is to be considered . . . to the full extent that the prospect of demand for such use affects the market value while the property is privately held.

*Id.* (quoting *Olson v. United States,* 292 U.S. 246, 255, 54 S. Ct. 704, 78 L. Ed. 1236 (1934)). In this connection, as the United States Supreme Court has explained, "the value may be determined in light of the special or higher use of the land when combined with other parcels, it need not be measured merely by the use to which the land is or can be put as a separate tract." *United States ex rel. Tennessee Valley Auth. v. Powelson,* 319 U.S. 266, 275 (1943) (citation omitted).

14

But this does not mean that market value is to be determined according to any theory of combination and adaptability the landowner can conjure up. Rather, "in order for that special adaptability to be considered, there must be a reasonable probability of the lands in question being combined with other tracts for that purpose in the reasonably near future." 319 U.S. at 275-76. The burden of establishing that reasonable probability, moreover, is the landowner's, and "[i]n absence of such a showing, the chance of their [the separate tracts] being united for that special use is regarded 'as too remote and speculative to have any legitimate effect upon the valuation.'" 319 U.S. at 276 (quoting *McGovern v. New York*, 229 U.S. 363, 372 (1913)).

The rule in Kentucky is in complete accord:

> Our cases have consistently observed the rule that it is appropriate to admit testimony of the adaptability of property for particular uses, even though the property is not then being so used. However, the rule is subject to the qualification that if the land is reasonably adaptable to another use, *there must be an expectation or probability in the near future that it can or will be so used.*

*Commonwealth, Dep't of Highways v. Stocker*, 423 S.W.2d 510, 517 (Ky. 1968) (quoting *Commonwealth, Dep't of Highways v. Gearhart*, 383 S.W.2d 922, 926 (Ky. 1964)) (emphasis supplied).

The Court of Appeals was concerned that the trial court violated this highest-and-best-use-of-the-property rule by emphasizing too much the limited use Putnam had made of its Modine factory, especially since about 2002, and by failing to give sufficient heed to the testimony by Putnam's appraiser that in conjunction with the factory tract, the 2.37 Subject Tract was adaptable for use as part of a highly valuable regional warehousing facility. The Court of Appeals

15

is certainly correct to the extent that Putnam's appraiser testified to the effect that warehousing facilities catering to the needs of long-distance trucking companies exist in other Kentucky cities served by different highways.

The Court of Appeals is also correct in noting that the trial court, in the two short "conclusions" paragraphs it devoted to the question, dismisses rather cursorily Putnam's long-distance warehousing theory as the highest and best use of the Subject Tract. Our review of the entire record, however, convinces us, contrary to the Court of Appeals' concerns, that the trial court was well aware of the highest-and-best-use rule noted above and, notwithstanding its succinct and unelaborated "conclusions," that the trial court appropriately rejected Putnam's integrated warehousing theory as unduly speculative. Putnam simply offered no evidence that the old and dilapidated Modine factory was in any way likely to be put to use as a high-end regional warehousing facility "in the near future." *Stocker,* 423 S.W.2d at 517.

With respect to the trial court's awareness of Putnam's responsibility to make that showing, we note in particular that following the District's cross-examination of Putnam's appraiser, the trial court itself questioned him for some fifteen transcript pages. The court focused, among other concerns, on whether the appraiser, in arriving at his notion of the property's highest and best use, considered at all whether there was evidence of an actual local demand for that use of the property. The appraiser testified that he did not. He said, in effect, that his job was to identify the property's potential, and having done so he assumed that eventually, through the mysterious workings

16

of the market, a buyer would materialize willing to pay for that potential. In the meantime, in his view, the landowner would be content to wait and to put the property to some interim use—as Putnam had done—and that it was none of his, the appraiser's, concern how long the wait might be.

The trial court basically had the Putnam appraiser's own admission that there was no reason to think that regional warehousing at the Modine facility was apt to take place in the reasonably near future. On the other hand, the trial court had evidence—the age and neglected condition of the building, the long history of the property's not being used for full-scale warehousing of any sort, and the District appraiser's report, noted above, which included the observation that Putnam had been actively marketing its Modine properties as "high potential" without success for at least several years—which tended to show that regional warehousing was not a reasonably imminent use. This record convinces us that contrary to the concerns voiced by the Court of Appeals, the trial court did not misconceive the law and was well within its discretion when it rejected Putnam's integrated-use/warehousing valuation of the Subject Tract taken by the District.

## II. The Trial Court Did Not Err by Relying on Putnam's Own Nine-Year-Old Valuation of its Property.

The Court of Appeals also believed that the trial court, having rejected the extreme stand-alone valuations of the Subject Tract offered by the contending sides ($60,000 vs. $608,000), erred in trying to arrive at its own valuation. In particular, the appellate panel faulted the court for its reliance on Putnam's 2002 internal transfer of the entire Modine property. That transfer,

17

in the panel's view, was, as a matter of law, too old and insufficiently objective to bear the evidentiary weight the trial court placed upon it. We agree with the District, however, that the trial court's valuation was not "clearly erroneous," for the purposes of CR 52.01, and that the Court of Appeals thus overstepped its role by setting that finding aside.

To recap briefly how this issue arose, the District claimed, based on what it maintained were sales of comparable vacant lots (so-called "comps"), that the subject property was worth $60,000. The trial court rejected that valuation as too low, because the purported comps either were not bona fide sales or involved properties of patently lesser commercial value. On the other hand, Putnam, claiming that standing alone the Subject Tract was suitable for development as medical office space and citing a starkly contrasting set of comps, placed a stand-alone value on the Subject Tract of more than $600,000. The trial court believed this valuation patently excessive, inasmuch as in 2012, about a year after the District took the 2.79 acre Subject Tract, Putnam sold the 8.4 acre remainder for considerably less—only $435,000. Thus dissatisfied with both parties' valuations, the trial court noted that in 2002 Putnam valued the entirety of its 11-plus Modine properties at $550,000. In light of the 2012 sale of the 8.4-acre remainder for $435,000, the difference—$115,000—struck the court as reasonable compensation for the Subject Tract.

Did the trial court err, as the Court of Appeals believed, by using Putnam's 2002 valuation of the entirety as though that were an acceptable

18

approximation of the value of the entirety at the time of the taking in 2011? Certainly, a nine-year-old comparable sale, even a sale involving the Subject Tract itself, is not the evidence one might hope for, and where there is evidence of markedly changed market conditions in the interim, a nine-year-old comp might retain so little probative value as not even to be admissible. *See, Commonwealth by State Highway Comm'n v. Combs*, 229 Ky. 627, 17 S.W.2d 748, 749 (1929) (holding inadmissible an eight-year-old prior sale of the subject property "made under conditions entirely different from those existing at the time of this trial").

In general, however, our case law has sought not to get bogged down in "collateral controversy over comparables,"[5] *Commonwealth, Dep't of Highways v. Cole*, 437 S.W.2d 736, 738 (Ky. 1968). Our approach, rather, has been to liberally allow the admission of evidence of other sales "where there are any reasonable elements of comparability," *Commonwealth, Dep't of Highways v. Whitledge*, 406 S.W.2d 833, 836 (Ky. 1966) (citations and internal quotation marks omitted), and we have granted considerable leeway to expert witnesses "to exercise their own skilled judgment in deciding" what those elements might be. *Hatfield v. Commonwealth, Dep't of Transp.*, 626 S.W.2d 213, 214 (Ky. 1982). Rather than excluding doubtful comps, where "the land being used for

---

[5] We realize, of course, that much of our eminent domain case law, including the evidentiary rulings here discussed, developed before the adoption in 1990 of the Kentucky Rules of Evidence. As Professor Lawson has noted, questions concerning the relation of the Rules to pre-existing cases can be vexed. Robert G. Lawson, *The Kentucky Evidence Law Handbook*, § 2.10, p.p. 86-87 (5th ed. 2013). No such questions having been raised in this case, however, we leave them for another day.

19

comparison is ill suited for that purpose due to its location, topography, size, or any other characteristic," we have relied on "its inadequacy [being] exposed . . . during cross-examination just as any other witness' testimony is challenged." *Id.* Under this approach, we have upheld the admission of comparable sales distant both in space and time from the condemnation. *Commonwealth v. Oakland United Baptist Church,* 372 S.W.2d 412, 414 (Ky. 1963) (upholding the admission of a comp more than ten miles away from the taking and observing that "distance alone [is] not a disqualifying factor"); *Maxwell v. Commonwealth, Dep't of Highways,* 404 S.W.2d 9, 11 (Ky. 1966) (upholding the admission of a comp six years prior to the condemnation and noting that despite evidence of changed conditions the prior sale was not "so remote as to lack relevancy"); *and cf. Combs,* 17 S.W.2d at 749 (noting that, while the eight-year-old prior sale of the subject property was not admissible in that case due to the radically altered market conditions, in the absence of evidence of such market changes, even prior-sale evidence that old could well be admissible).

With respect to the time gap in this case, Putnam has offered no evidence of market changes. Neither in its post-trial Motion to Reconsider before the trial court, nor in its brief before this Court, does Putnam contend that market conditions were radically different at the time of the taking in 2011 from those existing in 2002, when Putnam internally transferred its Modine properties and assessed them in conjunction with the transfer at $550,000. Putnam merely presumes, rather, as did the Court of Appeals, that nine years will produce changes that disqualify the comparison. According to Putnam, therefore, it is

the proponent of an "old" comp who bears the burden of showing why that presumption should not apply and in this case the District made no such showing.

In light of the cases discussed above, however, with their liberal rule of comparable sales admissibility, we believe that the presumption regarding more distant-in-time comps works in the opposite direction. Even seemingly remote comps, that is, are admissible and subject to cross-examination unless shown to have such attenuated probative value as to be irrelevant or misleading.

Notably, *Robinette v. Commonwealth, Dep't of Highways*, 380 S.W.2d 78 (Ky. 1964), which Putnam cites in support of its position on this question, is not to the contrary. Indeed, in that case the Court simply applied the liberal admissibility rule discussed above to uphold the admission of comps that occurred as much as three years prior to the taking. That "remoteness," the Court explained, did not "destroy their [the prior sales] probative worth as comparisons of valuation. . . [Rather,] [i]f distance or time of sale of comparable properties makes a difference, it is a matter [not of admissibility, but] to be developed by the expert under direct examination and cross-examination." *Id.* at 82.

Admittedly, a nine-year-old prior sale will raise questions about comparability. This particular nine-year period (2002 to 2011), however, as reflected in Putnam's appraisal report, was an unusually recessionary one. And, as the trial court noted, any presumption that after nine years the

property would have appreciated beyond compare would be further tempered by the fact that during that same period Putnam apparently ceased maintaining the Modine factory building and allowed it to deteriorate. Notwithstanding the nine-year gap, in other words, we think the trial court correctly determined that Putnam's 2002 transfer of its entire Modine properties remained sufficiently probative of 2011 values to be relevant and material here. The Court of Appeals erred, therefore, by deeming the prior transfer "incompetent" as a matter of law.

Putnam and the Court of Appeals also fault the trial court's use of the 2002 internal transfer of Putnam's Modine property because it did not represent an arm's length sale of the property, but was instead merely a transfer between related parties, the sort of "comparable sale" generally deemed an unreliable indicator of the purported comp's value and therefore inadmissible in a condemnation action. *Commonwealth Dep't of Highways v. Cecil*, 465 S.W.2d 250, 251-52 (Ky. 1971). As Putnam essentially concedes in its brief before us, however, the difference here is that the 2002 transfer was not a "comp" involving unrelated property and parties. Instead, it included the very property at issue, and it contains the owner's own attested assessment of value. It is well established that an owner's certified assessment of value is admissible in a condemnation action as an admission against interest. *Major v. Commonwealth, Dep't of Highways*, 448 S.W.2d 54, 55 (Ky. 1969) (citing *Commonwealth, Dep't of Highways v. Rankin*, 346 S.W.2d 714 (Ky. 1961), and *Maxwell*, 404 S.W.2d 9).

22

Although more-or-less conceding this point, Putnam still insists that the owner, Tom Putnam, testified that notwithstanding the certification, his understanding in 2002 was that the transfer price—$550,000 (excluding the price of some personalty)—represented only his father's half of the Modine property's value, not its full value. It was for the trial court, however, the fact-finder in this bench trial, to determine the weight and credibility of that testimony.

Putnam's and the Court of Appeals' final point is no more persuasive. They complain that the trial court somehow contradicted itself by rejecting Putnam's theory that its property was integrated and thus should be evaluated as a partial taking—the fair market value of the entirety immediately prior to the taking less the fair market value of the remainder immediately after, see KRS 416.660—but then turning around and using that very entirety minus remainder calculation to arrive at *its* valuation of the property. In their view, the trial court's rejection of Putnam's regional warehousing theory of integration somehow committed the trial court to valuing the Subject Tract on a stand-alone basis. In our view, the trial court attempted to do just that, but was frustrated by the parties' failures to present convincing evidence of a stand-alone value.

What the trial court rejected, however, was not the idea that the value of the Subject Tract could be determined by subtracting the value of the remainder from the value of the entire Modine tract. What it rejected was Putnam's claim that the value of the entirety—Putnam's dilapidated, sixty-year-

23

old former radiator factory and its two parking lots—was to be based upon modern, regional warehousing facilities operating in cities seventy miles or more from Paducah. There is no inconsistency in rejecting that theory, but then using the entirety-less-remainder approach with values for entirety and remainder that accord better with the property's real characteristics and circumstances.

Resisting that conclusion, Putnam contends, citing *State ex rel. Ordway v. Buchanan,* 741 P.2d 292 (Ariz. 1987), that if the Subject Tract has a stand-alone value greater than its value as part of a larger tract, then the condemnor must use the higher, stand-alone value. That may well be correct, but the point is irrelevant. Putnam's theory at trial was the opposite—that the Subject Tract was more valuable integrated with the whole, and it failed to offer persuasive proof, in the alternative, of the Subject Tract's stand-alone value,[6]

---

[6] Putnam several times complains that the trial court rejected its stand-alone valuation of the subject tract "based on nothing at all" but its own "sense" that the value was extravagant. As noted above, however, the trial court deemed Putnam's $608,000 stand-alone valuation for the 2.79 acre Subject Tract patently excessive in light of Putnam's sale, only a year later, of the 8.4 acre remainder for $435,000. Even granting that the comparison of the "improved" (or maybe "encumbered") remainder tract and the graveled parking lot that was taken is not as straight forward as would be the comparison of two vacant lots, the trial court's finding of excessiveness and accordingly its rejection of Putnam's stand-alone valuation, far from based on "nothing at all," was substantially based on the record and was not clearly erroneous.

In this same vein, at the end of trial, Putnam moved to introduce evidence tending to show, it claimed, that the purchaser of the remainder had razed the old Modine factory and was hoping to develop the factory tract as a medical office park. It claimed even to have evidence that this would-be developer was offering office space at $5/ sq. ft. The trial court disallowed this evidence (which Putnam introduced by avowal), on the grounds that it was untimely, the District having been given no prior notice of it, and was inadmissible anyway, since mere offers to buy or sell property obviously are not arm's length transactions and so are generally deemed not to be reliable evidence of market value. *Commonwealth, Dep't of Highways v. Rogers,* 399 S.W.2d 706, 708 (Ky. 1965) (citing *Combs, supra*). It might be observed that this

24

much less proof that it was worth more than the trial court determined by considering it a part of the whole.

Putnam's invocation of *Buchanan* notwithstanding, the trial court's valid rejections of Putnam's $10/sq. ft. regional-warehousing theory for valuing the entire Modine properties and its $5/sq. ft. office space theory for valuing the Subject Tract by itself do not entitle Putnam to a do over.[7] Rejecting valuations by both sides it had good reason to deem inadequate and excessive, respectively, the trial court appropriately did the best it could with the evidence the parties had provided. Its determination of the market value of the Subject Tract at the time of taking was reasonably based on duly probative (even if not ideal) evidence of the value of the entirety and of the remainder at that time, and as the trial court aptly noted, the result of that method was a compensation award for the taken 2.79 Subject Tract that harmonized well with the price Putnam accepted in 2012 for the remainder.

## CONCLUSION

In sum, we agree with the District that the trial court's rejection of Putnam's integrated-warehousing theory of the Subject Tract's best use was

---

evidence rather convincingly refutes Putnam's appraiser's insistence that the highest and best use of the Modine factory tract even apart from the Subject Tract was warehousing, thus lending support to the trial court's rejection of Putnam's warehousing theory for the combined tracts. Be that as it may, we are convinced that the trial court did not abuse its discretion by not allowing Putnam to reinvent its case at the end of trial, and with inadmissible evidence to boot.

[7] The appellate panel suggested that when it rejected the parties' appraisals the trial court should have appointed an appraiser pursuant to KRE 706. The Rule did indeed give the court that option, but in the circumstances of this case the procedures the Rule requires would have meant, essentially, a retrial. The trial court most assuredly did not abuse its discretion by deciding against that course here.

both legally sound (the theory requiring evidence of use for that purpose in the near future) and factually supported (there being no such evidence). We further agree that Putnam's 2002 self-assessment of its property's value and the 2012 sale of the remainder provided competent, substantial evidence supporting the trial court's determination of the Subject Tract's value at the time of taking in 2011. By second guessing the trial court's duly supported findings, the Court of Appeals exceeded the scope of its review. Accordingly, we hereby reverse the Court of Appeals Opinion and reinstate the Judgment of the McCracken Circuit Court.

Minton, C.J.; Cunningham, Keller, VanMeter, and Venters, JJ., concur. Wright, J., not sitting.

COUNSEL FOR APPELLANT:

Mark C. Whitlow
Nicholas M. Holland
Whitlow, Roberts, Houston & Straub, PLLC

COUNSEL FOR APPELLEE:

Samuel Wright
Farmer & Wright, PLLC

Dan Biersdorf
Biersdorf & Associates.